928 F.2d 1318
 59 USLW 2621, Fed. Sec. L. Rep. P 95,867
 RCM SECURITIES FUND, INC. and Max L. Heine,
Plaintiffs-Appellants, Cross-Appellees,
v.
E. Douglas STANTON, and Harold B. Matles as Trustees, and
Robert Conrod, Benjamin F. Litwin, Thomas A. Mudano,
Kathleen Durante and Lawrence A. McCarthy as Members of the
Administrative Committee of the M.H. Rhodes, Inc., Employee
Stock Ownership Trust for the Non-Bargaining Unit Employee
Group, Edward J. Doyle, Angelo B. Rucci, Morris F. Marks,
Jr., Robert C. Hunt, Jr., Lawrence A. McCarthy, Anthony J.
Campanelli, Sr., and Oliver W. Thompson as Directors of M.H.
Rhodes, Inc., and M.H. Rhodes, Inc., June Rhodes and Mark M.
Rhodes, as Co-Administrators of the Estate of Mark H.
Rhodes, Jr., and John J. Coleman as Executor of the Estate
of Louis C. Lerner, Defendants-Appellees,
June Rhodes and Mark M. Rhodes, as Co-Administrators of the
Estate of Mark H. Rhodes, Jr., Cross-Appellants.
 Nos. 1207, 1210, 1211, Dockets 90-7047, 90-7087, 90-7157.
 United States Court of Appeals,
Second Circuit.
 Argued May 2, 1990.
Decided March 26, 1991.
 
 Sharon S. Tisher, Hartford, Conn. (Day, Berry & Howard, Hartford, Conn., of counsel), for plaintiffs-appellants, cross-appellees.
 Andrew J. Levander, New York City (Adam B. Rowland, Shereff, Friedman, Hoffman & Goodman, New York City, of counsel), for defendants-appellees Edward J. Doyle, Angelo B. Rucci, Morris F. Marks, Jr., Lawrence A. McCarthy, Anthony J. Campanelli, Sr., Oliver W. Thompson, and M.H. Rhodes, Inc.
 Donald R. Holtman, Hartford, Conn. (Katz & Seligman, Hartford, Conn., of counsel), for defendants-appellees, cross-appellants June Rhodes and Mark M. Rhodes, as Co-Administrators of the Estate of Mark H. Rhodes, Jr.
 Richard C. Robinson, Hartford, Conn. (Sorokin, Sorokin, Gross, Hyde & Williams, P.C., Hartford, Conn., of counsel), for defendants-appellees E. Douglas Stanton and Harold B. Matles, as Trustees, and Robert Conrod, Benjamin F. Litwin, Thomas A. Mudano, Kathleen Durante and Lawrence A. McCarthy.
 Robert L. Wyld, Hartford, Conn. (Shipman & Goodwin, Hartford, Conn., of counsel), for defendant-appellee John J. Coleman as Executor of the Estate of Louis C. Lerner.
 Before KAUFMAN, FEINBERG and WINTER, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 This appeal arises from a shareholder derivative action brought to challenge two integrated transactions that allegedly disposed of assets amounting to one-third of a Delaware corporation's net worth and that transferred control of the corporation to an employee stock ownership plan, control of which is concentrated in high-level management. The district court dismissed the complaint on the ground that plaintiffs had failed to explain adequately their failure to make a demand upon the corporation's board of directors under Fed.R.Civ.P. 23.1. We conclude that state law, here that of Delaware, governs the need for such a demand. Delaware law excuses the failure to make a demand when, inter alia, particularized allegations in the complaint raise a reasonable doubt as to whether the directors exercised proper business judgment. Because we conclude that the allegations in the instant complaint suffice to create such a reasonable doubt, we reverse on the appeal. We dismiss the cross-appeal by the co-administrators of the Rhodes estate asking us to dismiss the complaint against them for failure to state a claim for relief.
 
 BACKGROUND
 
 2
 Our statement of facts is based upon the allegations of the amended complaint[1] and the affidavits and exhibits submitted by defendants. Defendant-appellee M.H. Rhodes, Inc. ("Company"), a publicly held Delaware corporation with corporate facilities in Connecticut, manufactures mechanical timing devices. Defendants-appellees Edward J. Doyle, Angelo B. Rucci, Morris F. Marks, Jr., Robert C. Hunt, Jr., Lawrence A. McCarthy, Anthony J. Campanelli, Sr., and Oliver W. Thompson (collectively "Directors") composed the board of directors of the Company during all or part of 1985 and 1986. Doyle was president and McCarthy was secretary of the Company during this period. The other five were outside Directors.
 
 
 3
 In January 1983, the Company established a non-contributory employee stock ownership plan, with a related trust, for the benefit of non-bargaining-unit employees of the Company (collectively "ESOP" or "Plan"). During the relevant time period, defendants-appellees E. Douglas Stanton and Harold B. Matles (collectively "Trustees") were appointed by the Directors to serve as trustees of the ESOP. In addition, Stanton served as treasurer and Matles as vice-president of the Company. Defendants-appellees Robert Conrod, Benjamin F. Litwin, Thomas A. Mudano, Kathleen Durante, and Lawrence A. McCarthy were appointed by the Directors to serve as members of the administrative committee to manage the ESOP. McCarthy was both a member of the Committee and a Director.
 
 
 4
 The Company initially funded the ESOP with a contribution of $85,000 cash and 5000 shares of the Company's common stock from its treasury. In 1984, it contributed $55,000 cash and 5000 treasury shares to the ESOP. These contributions, amounting to $140,000 and 10,000 shares, were the only contributions made prior to the transactions challenged in this action. By the end of 1985, the ESOP had fifty-six participants.
 
 
 5
 The Plan provides that contributions and forfeitures of stock (by departing employees whose term of employment was insufficient to cause their interest to vest) are to be allocated annually to the participants' accounts, with half of such contributions and forfeitures apportioned pro rata and half apportioned according to the ratio of the individual compensation to total participant compensation. Participants may direct the Trustees to vote their allocated shares in accordance with their instructions, and the Trustees are to vote the unallocated shares in the same ratio as the voting of the allocated shares. The Trustees are to use the same voting procedures in the event of a tender or exchange offer for shares of the Company.
 
 
 6
 In June 1985, Mark H. Rhodes, Jr., the founder, president, chairman of the board, and principal shareholder of the Company, died. At the time of his death, he owned 96,461 shares, or 39.2 percent of the outstanding common stock. Defendants-appellees and cross-appellants June Rhodes and Mark M. Rhodes (collectively "Rhodes defendants") are co-administrators of the Rhodes estate. At some point during the relevant time period, Louis C. Lerner, an owner of 26,800 shares of the Company, also died. Defendant-appellee John J. Coleman is executor of Lerner's estate.
 
 
 7
 In the six months between Rhodes' death and December 1985, the Company and the Rhodes estate received several inquiries from firms interested in acquiring the Company, including formal offers from RSR Industries, Inc. and Commercial Equities Corporation. On October 7, 1985, the Rhodes defendants made a formal request for the list of shareholders, a signal of a possible proxy solicitation.
 
 
 8
 The Directors met on October 16, 1985. In preparation for the meeting, Director Doyle made handwritten notes in which he indicated that the ESOP was the "KEYSTONE" to "prevent 'UNFRIENDLY TAKEOVER.' " At the meeting, the Directors met with Timothy Largay, a lawyer for the Rhodes estate, who told them that the Rhodes estate shares were for sale and that the estate was negotiating with third parties. Largay told the Directors that the estate had received an oral offer of $30 per share, and that the Directors "should assume that [the offeror] will want to control the Company." At the meeting, Director Rucci indicated that it "might seriously jeopardize the financial position of the Company" to finance a purchase of the Rhodes shares at $30, and Director Marks indicated that a purchase of the shares at a premium might be illegal. On November 12, Largay informed the Directors that the estate regarded a bid by RSR of $28 per share as fair and that the estate was prepared to cooperate with RSR in acquiring the Company, a fact perhaps underscored by the prior demand for a list of shareholders.
 
 
 9
 The amended complaint further alleges that on November 12, Largay also told an attorney for the Company that the Rhodes estate would sell its shares to the Company or to the ESOP only if all outstanding shares were acquired at the same premium paid to the estate. On November 18, Largay reduced these demands and agreed to have the Rhodes estate go ahead with the sale at $28 per share if the Company either indemnified the estate against actions by other shareholders or purchased the Lerner estate's shares at a premium to forestall it from instituting such litigation. Largay is alleged to have cited to a representative of the Company legal authority that a purchase of a block of shares from a large shareholder at a premium in order to thwart a takeover was a breach of the Directors' fiduciary obligations and might expose the seller to liability as an aider or abettor. The Directors were advised of Largay's communications on November 12 and 19, respectively. A month later, the Directors agreed to the acquisition of the Lerner shares as suggested by Largay.
 
 
 10
 In December 1985, at the instigation of the Directors, the Trustees, and the Committee, the ESOP was amended to provide for loans to finance the purchase of shares of the Company. As of December 1, 1985, just prior to the transactions at issue, the ESOP held 24,182 shares of common stock, or 9.8 percent of the Company's outstanding shares of common stock. Shortly after the amendment, on December 19, 1985, the Directors authorized a loan of $2.55 million and a cash contribution of $175,000 to the ESOP, in order to permit the ESOP to purchase the shares held by the Rhodes estate. The Company financed the loan to the ESOP by borrowing $2.55 million from Connecticut National Bank, secured by a fifteen-year mortgage on the Company's corporate and manufacturing facilities in Connecticut. Also on December 19, the ESOP, pursuant to an agreement with the Directors, purchased the 96,461 shares held by the Rhodes estate for a total price of $2,700,908. The $2.55 million loan and $150,908 of the cash contribution financed the purchase. This transaction, which we shall style "the Rhodes/ESOP transaction," nearly quintupled the number of shares held by the ESOP. After the transaction, the ESOP held 120,643 shares, or 49.1 percent of the outstanding shares of common stock of the Company.
 
 
 11
 The ESOP paid $28 per share for the Rhodes shares, or, roughly speaking, a premium somewhere between 50 and 100 percent, given a market price alleged to have ranged from $14 to $19 per share at relevant times. The shares bought with the loan proceeds were held in a "suspense account" as unallocated shares and were to be allocated to ESOP participants as the loan was paid. Consequently, as of December 27, 1985, 21,682 shares in the ESOP were allocated, whereas 98,961 were unallocated.
 
 
 12
 The agreement between the ESOP and the Company provided for contributions by the Company to the ESOP in the exact amount and at the same time as loan repayments by the ESOP to the Company fell due. Thus, the loan from the Company to the ESOP was essentially a contribution financed by a mortgage on the Company's principal real estate holdings.
 
 
 13
 On December 30, 1985, the Company filed a Form 8-K with the Securities and Exchange Commission ("SEC") reporting a change of control of the Company. The 8-K, however, is alleged to have been incomplete in two respects. First, it failed to report the mortgage as a disposition of assets in excess of 10 percent of the Company's total assets, as required by SEC Rule 15d-11 and Form 8-K itself. Second, it failed to disclose that the Company had a contractual obligation to match the ESOP's loan repayments with offsetting contributions from the Company to the ESOP.
 
 
 14
 On February 13, 1986, the Company purchased the 26,800 shares held by the Lerner estate, which were then retired to the Company's treasury. We shall style this purchase "the Lerner transaction." The purchase price was $670,000, or $25 per share, amounting to a premium of roughly 25 to 80 percent, given a market price alleged to have ranged from $14 to $20 at relevant times. The Rhodes/ESOP and Lerner transactions left the ESOP with 55.08 percent of the Company's outstanding common shares and control of the Company.
 
 
 15
 The Company is alleged not to have disclosed these transactions to its shareholders until April 1, 1986, when it issued its 1985 Annual Report and Form 10-K, as well as proxy materials for the annual meeting. However, these documents are alleged not to have fully disclosed the details or even the basic terms of the transactions.
 
 
 16
 The Rhodes/ESOP and Lerner transactions are alleged to have had a substantial effect on the corporation and the remaining minority shareholders. They reduced net worth and shareholders' equity by 37 percent and increased long-term indebtedness by almost seventeen-fold from $300,000 to nearly $5 million. By May 22, 1986, the market price for the Company's shares had fallen to $10.50 per share, a decline alleged to have been caused by the transactions in question.
 
 
 17
 On October 27, 1986, RCM Securities Fund, Inc. and Max L. Heine filed a shareholder derivative suit in the District of Connecticut, alleging violations of, inter alia, federal securities laws and Delaware state corporate law. In particular, the complaint alleged that the Form 8-K, the proxy statement, the Annual Report, and the Form 10-K were misleading and contained material misrepresentations and omissions in connection with the purchase of the Rhodes and Lerner shares, as well as the related loan transactions, and constituted violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j (1988), and SEC Rule 10b-5, 17 C.F.R. Sec. 240-10b-5 (1990), promulgated thereunder. It further alleged that the transactions in question constituted corporate waste, self-dealing, and a fraud on the Company in breach of the Directors' fiduciary duties that could have been enjoined under Delaware law had shareholders been accorded full and fair disclosure. The complaint also asserted violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. Secs. 1001-1461 (1988). As relief, the complaint sought recission of the Rhodes/ESOP and Lerner transactions as well as the related loan agreements, an accounting, and damages.
 
 
 18
 The initial complaint alleged that demand on the Directors was unnecessary because it would have been futile in light of the fact that the Directors each "participated in and profited from the transactions, wrongs, and corporate waste underlying the litigation." On January 9, 1987, the Company, the Directors, the Trustees, and the Committee collectively moved to dismiss the complaint for failure to satisfy Fed.R.Civ.P. 23.1, which, they asserted, contained a demand requirement that had not been satisfied. Also on January 9 the Rhodes defendants moved to dismiss the complaint for failure to plead fraud with particularity and failure to state a claim under Section 10(b). The district court referred the motions to Magistrate Eagan, who recommended that they be denied. Nevertheless, on April 19, 1989, the district court granted the motion as to the demand issue but allowed the plaintiffs to amend their complaint. Because of this ruling, it did not rule on the Rhodes defendants' separate motion to dismiss.
 
 
 19
 The amended complaint alleged that the Directors had entered into the Rhodes/ESOP and Lerner transactions in order to entrench themselves in control of the Company. The amended complaint failed to indicate the current composition of the board. We are informed, however, that at the time of the filing of the amended complaint, six of the nine members of the board were outside directors, and only four were Directors or otherwise associated with the Company at the time of the transactions in issue. The amended complaint also expanded the allegations against the Rhodes defendants and Coleman. It alleged that these defendants knew that the purchase of their shares by the ESOP and the Company respectively were corporate waste and a fraud on the Company and that the disclosure to the shareholders was materially misleading. Plaintiffs thus claimed that the Rhodes and Lerner estates were aiders and abettors of the various violations of state and federal law. In addition to the relief requested in the original complaint, the amended complaint sought imposition of a constructive trust on the proceeds received by the Rhodes and Lerner estates for their shares.
 
 
 20
 On June 1, 1989, the Directors once again moved to dismiss for failure to satisfy Rule 23.1, and the district court granted the motion as to those defendants on October 19, 1989. Then the remaining defendants, including the Trustees, the Committee, Coleman, and the Rhodes defendants, also moved to dismiss on the basis of Rule 23.1, and the district court dismissed the complaint as to all these remaining defendants on December 12, 1989. Judgment was entered in favor of all defendants on December 15. The plaintiffs appealed from this judgment, and the Rhodes defendants cross-appealed from the district court's refusal to rule on their original motion to dismiss.
 
 DISCUSSION
 
 21
 Plaintiffs-appellants argue that the district court erred by applying federal rather than state law in deciding whether they were excused from making a demand on the board of directors. They assert that, under Delaware law, demand in the instant matter is excused as futile. Alternatively, appellants argue that, even under federal law, demand is excused.
 
 1. State or Federal Law
 
 22
 We have never decided whether state or federal law supplies the rule of decision under Fed.R.Civ.P. 23.1 regarding the adequacy of a derivative plaintiff's efforts to secure director action, or whether the source of that rule of decision turns on the underlying claim being state or federal. In Kaster v. Modification Systems, Inc., 731 F.2d 1014, 1017-18 (2d Cir.1984), and Lewis v. Graves, 701 F.2d 245, 247-48 (2d Cir.1983), we cited only federal decisions in applying Rule 23.1, but did not hold that federal, rather than state, law governed. See also Samuel M. Feinberg Testamentary Trust v. Carter, 652 F.Supp. 1066, 1072 n. 2 (S.D.N.Y.1987) (applying federal law because federal substantive claims were involved) (citing Kaster ). Moreover, it is anything but clear whether the federal decisions cited in Kaster and Lewis were applying state or federal law. Nor has any of our cases ever acknowledged a difference between a supposed federal rule and that of any particular state.
 
 
 23
 We have, however, more recently applied state substantive law in determining whether the demand requirement was excused in a derivative action stating both common-law and federal claims. See Norlin Corp. v. Rooney, Pace Inc., 744 F.2d 255, 261-62 (2d Cir.1984). Nevertheless, Norlin, like Lewis and Kaster, did not squarely address the issue.
 
 
 24
 We begin by examining the language of Rule 23.1. It provides in pertinent part:
 
 
 25
 In a derivative action brought by one or more shareholders or members to enforce a right of a corporation ..., the complaint shall be verified and shall allege ... with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority....
 
 
 26
 Fed.R.Civ.P. 23.1.
 
 
 27
 The plain language of the Rule, which governs our construction of it, see Pavelic & LeFlore v. Marvel Entertainment Group, 493 U.S. 120, 110 S.Ct. 456, 458, 107 L.Ed.2d 438 (1989), does not even purport to impose a demand requirement. It merely requires the pleader to "allege ... with particularity the efforts, if any" made to induce the directors to bring the litigation in question. The standard for determining the adequacy of these efforts must thus be found outside the four corners of the Rule.
 
 
 28
 Considerable guidance as to the proper source of that standard is found by examining the purposes served by the demand requirement. One purpose might be to reduce litigation, but, as Judge Easterbrook has noted, the demand rule causes more litigation than it stops. See Starrels v. First Nat'l Bank of Chicago, 870 F.2d 1168, 1173 (7th Cir.1989) (concurring opinion). The true purpose of the demand requirement is " 'to allow the directors the chance to occupy their normal status as conductors of the corporation's affairs.' " Lewis, 701 F.2d at 247 (quoting Elfenbein v. Gulf & Western Indus., Inc., 590 F.2d 445, 450 (2d Cir.1978)). Whether a corporation should bring a lawsuit is a business decision, see Kamen v. Kemper Financial Services, Inc., 908 F.2d 1338, 1342-43 (7th Cir.), cert. granted in part, --- U.S. ----, 111 S.Ct. 554, 112 L.Ed.2d 561 (1990), and the directors are, under the laws of every state, responsible for the conduct of the corporation's business, see, e.g., 8 Del.Code Sec. 141(a) (1987), including the decision to litigate. A shareholder demand that the corporation bring litigation is thus a method by which the appropriate corporate authority may be consulted about litigation to be brought in the name of the corporation.
 
 
 29
 Judicial review of a corporate decision to bring, not to bring, or to terminate a lawsuit is in turn governed by the business judgment rule, as determined by the law of the state of incorporation. The law of that state applies even where federal claims are involved. In Burks v. Lasker, 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979), the Supreme Court addressed the question of whether a corporation's independent directors had the power to terminate a non-frivolous derivative action that was based on federal claims. The Court held that the directors might terminate such an action if such a termination was authorized by the law of the state of incorporation. State law thus governs "the powers of directors unless the state laws permit action prohibited by the [federal statutes involved] or unless 'their application would be inconsistent with the federal policy underlying the cause of action.' " Id. at 479, 99 S.Ct. at 1837 (quoting Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 465, 95 S.Ct. 1716, 1722, 44 L.Ed.2d 295 (1975)).
 
 
 30
 The precise state law at issue in Burks was the business judgment rule and the power of special litigation committees to terminate derivative litigation. See generally Joy v. North, 692 F.2d 880 (2d Cir.1982), cert. denied, 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983); Zapata v. Maldonado, 430 A.2d 779 (Del.1981); Auerbach v. Bennett, 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979). Nevertheless, the reasoning of Burks fully applies to the existence and scope of a demand requirement and of a futility exception to that requirement.
 
 
 31
 The demand requirement and the business judgment rule are based on identical principles of the law of corporate governance. As the Delaware Supreme Court has noted, "[i]nextricably bound to threshold questions of demand futility are issues of business judgment, and the standards by which director action is measured." Pogostin v. Rice, 480 A.2d 619, 624 (Del.1984). The scope and nature of a demand requirement thus turns on the view one takes of the role and power of the directors concerning litigation brought in the corporation's name. As a result, in many jurisdictions, the power of directors to terminate derivative litigation through a special litigation committee turns in part on state law regarding demand and the futility exception. Many states thus show greater deference to the judgment of special litigation committees in cases in which demand is legally required than in cases in which demand is legally excused. See Joy, 692 F.2d at 891; Zapata, 430 A.2d at 787-89. In a sense, therefore, Burks is almost directly on point.
 
 
 32
 Because, as Burks held, state law governs the power of directors to terminate derivative litigation based on federal claims--absent some direct conflict between the conduct allowed under state law and the pertinent federal statute--state law also governs the adequacy of efforts made by a complaining shareholder to secure director action in bringing such litigation. Burks stressed that questions regarding the role of directors in derivative litigation are governed by state law and that federal law may limit the power of directors "but only rarely creates it." 441 U.S. at 478, 99 S.Ct. at 1837. Indeed, the only body of federal law to which federal courts can look for guidance in fashioning a demand requirement, or exceptions to that requirement, is the federal common law. See Hawes v. Oakland, 104 U.S. 450, 460-61, 26 L.Ed. 827 (1881). Hawes, however, surely established a substantive rule that has succumbed to Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).
 
 
 33
 There is nothing procedural about a rule that regulates the role and power of a board of directors in determining the business wisdom, or lack of such, regarding litigation brought in the corporation's name. Those who believe that directors should play a decisive role in such litigation will favor a stringent demand requirement; those who believe that directors should play a diminished role will favor a relaxed demand requirement with many exceptions. The demand requirement is thus determined by one's view of the role and power of directors with respect to derivative litigation, qualified in the case of federal claims only by the need to ensure that a particular federal policy at issue is not frustrated.
 
 
 34
 Where a state claim is involved, therefore, the source of the demand requirement must be the law of the state of incorporation. Nothing in Rule 23.1 suggests otherwise, and Erie dictates the application of state law. Erie, of course, does not compel resort to state law in derivative actions based on federal claims, although Burks and the lack of a demand requirement in Rule 23.1 are in our view dispositive.
 
 
 35
 Even without Burks, however, there are strong reasons to look to state law demand requirements where federal claims are involved. If federal courts were to fashion a demand requirement for federal claims, the existence of differing state and federal demand requirements would undermine the very purpose of the demand requirement. If a state demand requirement were to apply to state claims and a federal demand requirement were to apply to federal claims, a plaintiff bringing a derivative suit based on a single transaction might well be subject to a demand requirement as to one legal theory while excused from making a demand as to another legal theory. However, the purpose of the demand requirement is to give the directors an opportunity to decide whether to bring or not to bring a single lawsuit. That business decision cannot be a truly sensible one if it involves only half of the lawsuit. In the typical case involving mixed claims, the decision will be either to bring a lawsuit based on both the state and federal legal theories or not to bring the lawsuit at all. Particular legal theories are of concern to business people only infrequently, if that. If the demand requirement is seriously intended to give directors a chance to play their role, therefore, their deliberation of a lawsuit necessarily will involve the wisdom of that litigation as a whole, including both state and federal claims. This case is a particularly compelling example of the difficulty of considering only some of the legal theories implicated in proposed litigation because, as discussed in the margin,[2] the state and federal claims are interdependent.
 
 
 36
 Needless complexity, needless litigation, and perhaps the loss of substantive claims would also result from a rule that state law governs the demand requirement involving a state claim but federal law governs where a federal claim is in issue. An illustration can be found in decisions of the Seventh Circuit. See Kamen, 908 F.2d 1338; Starrels, 870 F.2d at 1172-76 (Easterbrook, J., concurring). Having held that different bodies of law apply to state and federal claims, the Seventh Circuit thereafter fashioned a federal demand requirement that is at odds with the law of many states, and, in particular, with the law of Delaware. In fashioning the content of the demand rule governing derivative claims based on federal law, Kamen adopted the American Law Institute's recommendation, which abandons the futility exception. See Principles of Corporate Governance, Secs. 7.03, 7.08 and commentary at 64-71 (Tent.Draft No. 8, 1988).
 
 
 37
 Kamen concluded that the futility exception had generated needless litigation. It observed that arguments about futility where a demand has not been made are reduced to speculation about director action or inaction. Judge Easterbrook's opinion thus concluded, "If demand is useful, then let the investor make one; if indeed futile, the board's response will establish that soon enough. In either case, the litigation may proceed free of arguments about whether a demand should have been made in the first place." 908 F.2d at 1344. Kamen added, however, that the making of a demand would not alter the effect, or lack thereof, of the business judgment rule on the underlying claims asserted by the plaintiff. See id. at 1347.
 
 
 38
 Were we a state court fashioning a demand requirement, we would not quarrel with Kamen's reasoning. However, application of the Kamen rule in cases with mixed state and federal claims based on a single transaction would create at best daunting complexities, at worst grave perils for the shareholder plaintiff. Most jurisdictions, including Delaware, recognize a futility exception to their demand requirement. See infra. Thus, the Kamen rule would lead in some cases to the odd situation described above in which demand is required as to federal claims but not as to state claims.
 
 
 39
 The oddity might not matter if, after the demand was made, the lawsuit could proceed as Kamen contemplates. However, Delaware also departs from that aspect of the Kamen rule that allows plaintiffs to preserve their substantive claims while making a demand. Under Delaware law, the effect of a shareholder demand upon a board of directors is to deprive derivative plaintiffs of the right to argue futility and to "place control of the derivative litigation in the hands of the board." Spiegel v. Buntrock, 571 A.2d 767, 775 (Del.1990). The effect of a demand is thus to "concede[ ] the independence of a majority of the board to respond," id. at 777, and to alter the nature of the plaintiff's claim. If no demand is made, the derivative action may challenge the underlying transaction, and the complaint will not be dismissed because of the business judgment rule if it has alleged a prima facie breach of a fiduciary obligation. Once a demand is made, however, the challenge under Delaware law must be not to the underlying transaction, but to the board's decision not to bring the lawsuit. This decision, which will often be made by new directors who were not involved in the underlying transaction, in turn will be shielded by the business judgment rule unless the shareholder plaintiff can carry the considerable burden of showing that the decision not to bring the lawsuit was made in bad faith or was based on an unreasonable investigation. See id.; see also Note 3 infra. If reported cases are any indication, few, if any, plaintiffs surmount this obstacle. Delaware law thus substantially alters the nature of a derivative plaintiff's claim where demand has been made and conversely gives shareholders considering litigation good reason not to make a demand.
 
 
 40
 In a case with mixed Delaware and federal claims, therefore, Kamen requires a demand as a prerequisite to suit while Delaware law, as enunciated by Spiegel, holds that a demand will alter the state claims that thereafter may be brought. Arguably, Kamen and Spiegel can be reconciled by holding that a demand made because Kamen requires it as a prerequisite to bringing derivative claims in a federal court does not cause any loss of state substantive rights. Much of Spiegel's language does in fact suggest that its underlying rationale is based on a waiver theory. See 571 A.2d at 774-76. However, the precedents on which Spiegel relied are in no way so limited, and the waiver rationale is in any event baseless.
 
 
 41
 Spiegel's earliest known ancestor, Zapata, indicated that once a board has addressed the desirability of particular litigation--whether upon a shareholder demand or its own initiative--courts must accord some deference to the board's decision. See 430 A.2d at 784-86. The latest precedent for Spiegel was Stotland v. GAF, 469 A.2d 421 (Del.1983), which held that, under Zapata, a written demand by one of two named plaintiffs brought after a derivative action had been commenced rendered the action moot. See id. at 422-23. That holding, which mooted the action as to the shareholder who had not made a demand and all other members of the class as well, was thus not based on a waiver theory.
 
 
 42
 Indeed, waiver--the voluntary relinquishment of a known right--is totally out of place in the context of a derivative action. Such an action resembles a mandatory class action, and a demand by a single shareholder that causes all shareholders to lose substantive rights cannot be labeled a waiver.
 
 
 43
 The true rationale of Spiegel thus seems to be that a demand by any shareholder necessarily involves the board in decisions concerning the derivative action, and that the Zapata rule concerning director control of that action is triggered by the first demand. This conclusion also follows logically from the Delaware rule that a board receiving a demand cannot remain neutral but must act upon that demand. See Kaplan v. Peat, Marwick, Mitchell & Co., 540 A.2d 726, 731 (Del.1988).
 
 
 44
 Finally, one must expect that once a demand has been made with respect to the federal claims, every board will do the sensible thing and consider the entire lawsuit. This consideration will result in a board decision one way or the other with all of the legal consequences that will automatically flow from Spiegel. There is, therefore, every reason to believe that under Delaware law, once a Kamen demand is made as to federal claims, the board will speak to the entire lawsuit, and the Spiegel rule will thereafter apply. This seems particularly the case where, as in the instant matter, the state and federal legal theories are interdependent. See supra Note 2.
 
 
 45
 Other anomalies resulting from separate federal and state demand requirements seem inevitable. For instance, because a federal demand requirement is derived from federal substantive law rather than Rule 23.1, that requirement would govern demands regarding federal claims brought in state courts as well. Moreover, separate requirements may deter the bringing of meritorious federal claims. Plaintiffs contemplating a derivative action based in part on the law of a jurisdiction like Delaware may be justifiably apprehensive that the assertion of federal claims requiring a demand will, as a result of the demand, impede or prevent the assertion of state claims. The Kamen rule itself may therefore cause derivative plaintiffs to forgo valid federal claims.
 
 
 46
 We thus agree with Justice Steven's concurrence in Daily Income Fund, Inc. v. Fox, 464 U.S. 523, 543, 104 S.Ct. 831, 842, 78 L.Ed.2d 645 (1984), that Rule 23.1 is not the source of a demand requirement but is only a procedural requirement empowering federal courts to determine from the pleadings whether the demand requirement has been met. Justice Stevens properly pointed out that only this construction of Rule 23.1 is consistent with the provision in the Rules Enabling Act that the "rules shall not abridge, enlarge or modify any substantive right." Id. at 544 n. 2, 104 S.Ct. at 842 n. 2 (quoting 28 U.S.C. Sec. 2072(b) (1988)). Moreover, the SEC filed an amicus curiae brief in Daily Income Fund that asserted that state law governed the need for demand upon directors in a derivative action based on a federal claim. See id. at 532 n. 8, 104 S.Ct. at 837 n. 8. Given the enforcement responsibility of that agency with regard to a battery of federal regulatory statutes at the heart of corporate law, we accord some weight to its view.
 
 
 47
 We therefore hold that Rule 23.1 is a rule of pleading that creates a federal standard as to the specificity of facts alleged with regard to efforts made to urge a corporation's directors to bring the action in question. However, the adequacy of those efforts is to be determined by state law absent a finding that application of state law would be inconsistent with a federal policy underlying a federal claim in the action, a qualification of no relevance to the instant matter. See DeMott, Demand in Derivative Actions, 19 U.C. Davis L.Rev. 461, 466 (1986).
 
 2. Demand Excused
 
 48
 Demand is excused under Delaware law if the derivative plaintiff can meet the Delaware standard for demonstrating the futility of such a demand. Under that standard the particularized allegations of the complaint must
 
 
 49
 raise a reasonable doubt as to (i) director disinterest or independence or (ii) whether the directors exercised proper business judgment in approving the challenged transaction.
 
 
 50
 Grobow v. Perot, 539 A.2d 180, 186 (Del.1988) (citing Aronson v. Lewis, 473 A.2d 805, 814 (Del.1984)). The test is disjunctive; demand is excused when the complaint alleges facts that raise a reasonable doubt as to either director independence or the exercise of proper business judgment. See id. at 188-89.
 
 
 51
 With regard to the first prong of the Aronson test, appellants argue that the purpose of the challenged transaction was entrenchment and that the presence of this motive infringes the shareholders' right to a decision by a disinterested and independent board. The allegations of the complaint indicate that certain other firms were interested in acquiring control of the Company, and that some members of the board were apprehensive about this development. One member, Doyle, allegedly viewed the ESOP as a "KEYSTONE" to "prevent 'UNFRIENDLY TAKEOVER.' " The complaint also alleges that, through Largay, the Rhodes estate informed the board that it had been approached by third parties interested in buying the estate's bloc of stock. The Rhodes estate also made it clear to the board that any such purchaser would use this large bloc as the foundation to take control of the Company.
 
 
 52
 The fatal gap in the allegations, however, is their failure to demonstrate that the Directors could not be disinterested or independent in assessing the situation and responding to it. Delaware law does not assume that directors have a self-interest in preserving their positions even where an ESOP is found to be a defensive device against threatened hostile takeover. See Shamrock Holdings, Inc. v. Polaroid Corp., 559 A.2d 257, 274 (Del.Ch.1989). To be sure, the "inside" Directors might have feared for their jobs in management as a result of such a takeover and thus might not have been disinterested. The "outside" Directors, however, were a majority of the board both at the time of the challenged transaction and at the time of the amended complaint. It is true that one Director was an officer of the bank that made the loan to the Company in exchange for the mortgage. However, the complaint alleges no facts demonstrating that that Director acted for the Company in seeking the loan, acted for the bank in granting the loan, or personally profited in any way.
 
 
 53
 Finally, the complaint alleges in conclusory fashion that the Directors "participated" in and "profited" from the challenged transaction. The only participation of outside Directors evident on the face of the complaint and accompanying evidentiary submissions is the approval of the Rhodes/ESOP and Lerner transactions. Such approval by itself is insufficient under Delaware law to raise a reasonable doubt as to the independence of outside directors. See Aronson, 473 A.2d at 815. So far as profiting from the transaction is concerned, there are no particularized allegations. It appears that the highest annual fee paid any Director was $2,250, an amount that cannot plausibly be regarded as sufficient to support a finding of an entrenchment motive.
 
 
 54
 We turn then to the second prong of the Aronson analysis--whether the particularized allegations "raise a reasonable doubt as to ... whether the directors exercised proper business judgment in approving the challenged transaction." Grobow, 539 A.2d at 186. Under Delaware law, proper business judgment means the exercise of substantive due care--the terms of the transaction--and procedural due care--an informed decision. See id. at 189. Particularized allegations that create a reasonable doubt whether due care in either sense was exercised will deprive the defendants of the benefit of the business judgment rule and will excuse demand.[3] We believe that, in the instant matter, the plaintiffs have created a reasonable doubt as to whether substantive due care was satisfied with regard to the Rhodes/ESOP and Lerner transactions.
 
 
 55
 With regard to substantive due care--whether the terms of the alleged transaction are such that the complaint establishes "a prima facie [case of] waste," id.--we conclude the allegations of the complaint are sufficient to excuse demand. Delaware law, of course, requires us to accord considerable deference to the judgment of an independent board, and plaintiffs bear the burden of pleading particularized facts establishing a reasonable doubt as to the adequacy of the terms of the transaction. Giving the full measure of deference due the board's judgment, we nevertheless conclude that plaintiffs have carried that burden.
 
 
 56
 The transactions in question not only shifted control of the corporation to the ESOP but also disposed of, or committed the corporation to disposing of, a very substantial proportion of the Company's assets. The amended complaint alleges that at year-end 1985 the Company's (and a consolidated subsidiary's) total assets were $10,227,219. The mortgage funding the Rhodes/ESOP transaction thus committed 25 percent of total assets as security for the loan. Because the mortgage covered the principal real estate holdings of the Company, its existence clearly limited the Company's ability to raise working capital in the future. Although the mortgage enabled the Company to make a "loan" to the ESOP, the ESOP did not undertake any obligation to repay the loan. Rather, the Company is alleged to have obligated itself to make future contributions to the ESOP in amounts and at times that matched the repayment schedule of the mortgage note. That schedule is not in the record, but if the principal were repaid in fifteen annual payments, each payment would amount to $170,000. The payment of interest, of course, would substantially increase the Company's annual obligations.
 
 
 57
 The transactions in question also involved the disposition of a substantial amount of the Company's cash. A $175,000 contribution to the ESOP enabled it to meet the Rhodes estate's price, while another $670,000 was paid by the Company to the Lerner estate for its shares, as insisted upon by Largay acting on behalf of the Rhodes estate, in order to avoid litigation by the Lerner estate. It is alleged that, by the time the Rhodes/ESOP and Lerner transactions were completed, over one-third of the Company's net worth and shareholder equity had been disposed of.
 
 
 58
 The relevant question under Delaware law is "whether 'what the corporation has received is so inadequate in value that no person of ordinary, sound business judgment would deem it worth that which the corporation has paid.' " Grobow, 539 A.2d at 189 (quoting Saxe v. Brady, 184 A.2d 602, 610 (Del.Ch.1962)). We believe the allegations of the amended complaint meet that standard. Although the alleged cost to the Company of the Rhodes/ESOP and Lerner transactions is very substantial, the benefits received by the Company, if any, bear no reasonable relationship to that cost.
 
 
 59
 Based on the materials in the record, two possible purposes for the Rhodes/ESOP and Lerner transactions appear. First, they may have been intended to thwart a hostile takeover. Second, appellees assert a business purpose in consummating the "long standing" plans of the Company in transferring control to the ESOP for purposes of securing higher productivity from the ESOP-member employees.
 
 
 60
 In the course of rebutting the entrenchment claim, appellees deny that the transactions were intended to thwart a takeover. They expressly describe plaintiffs' claim that the transaction was "an anti-takeover strategem" as a "mischaracteriz[ation]." Brief of Appellees Doyle et al. at 46. Appellees argue only that, even if the anti-takeover motivation was mistakenly perceived as motivating the Rhodes/ESOP and Lerner transactions, the presence of that motivation alone would be insufficient to demonstrate entrenchment in order to satisfy the first prong of the Aronson test. See id. at 46-49.
 
 
 61
 Had these transactions been designed to thwart a takeover, the independent Directors would have had an obligation under Unocal v. Mesa Petroleum Co., 493 A.2d 946, 955 (Del.1985), to determine (a) that defensive measures against a would-be hostile acquirer were necessary because the acquirer posed "a danger to corporate policy and effectiveness," and (b) that the defensive measure adopted was "reasonable in relation to the threat posed." There is no claim by appellees that they inquired into the nature of the would-be acquirers, the terms of any offer they might make, or their plans for operating the Company. Moreover, there is no reason for us to presume that such inquiries were made given appellees' outright denial that the Rhodes/ESOP and Lerner transactions were motivated by anti-takeover considerations. The transactions cannot, therefore, be viewed as legitimate defensive measures to thwart a coercive or otherwise harmful takeover. Indeed, if the transactions were takeover-motivated, the denial of such a motivation may itself be a breach of the Directors' fiduciary obligations and various provisions of federal securities laws.
 
 
 62
 We turn now to the sole business purpose asserted by appellees, namely, that the Rhodes/ESOP transaction enabled the Company to consummate what appellees describe as the "long standing" plan of transferring control to the ESOP. This purpose is based on the following statement from the ESOP Plan as quoted in appellees' brief:
 
 
 63
 The prosperity and growth of the M.H. Rhodes, Inc. (the "Company") are highly dependent upon the individual contribution of each of its Employees. It is therefore necessary to attract and retain well qualified Employees; and it is appropriate to provide an incentive for the continuing improvement of the contribution of each Employee of the Company.
 
 
 64
 ....
 
 
 65
 Because this Plan's assets will be invested primarily in Company Common Stock, it enables Employees to acquire an ownership interest in the Company. It provides Employees with a direct and vested interest in the success of the Company, permits Employees to share in any capital growth of the Company, and provides Employees with a benefit, the value of which is directly influenced by their own efforts. It is hoped that ultimately the Plan may enable Participants to obtain and maintain control of the Company and thereby enhance the job security of Participants by maintaining the corporate autonomy of the Company.
 
 
 66
 The plan may be used to accomplish the following objectives: (a) to transfer the ownership of stock in the Company, including the stock of principal owners in the Company, to the participating Employees; and (b) to provide Participants with beneficial ownership of Company stock, without requiring any cash outlay, and reduction in pay or other personal investment on the part of Participants.
 
 
 67
 Brief of Appellees Doyle et al. at 4-5 (emphasis in brief). Appellees also note that there is evidence in the record that Mr. Rhodes had indicated that he hoped his shares would someday be transferred to the ESOP.
 
 
 68
 Creation of an ESOP with a view to increasing productivity by giving employees a stake in a firm is a legitimate business purpose. See Shamrock Holdings, 559 A.2d at 272 n. 16. Nor is there any question that an ESOP may contemplate future control of the company. However, there are limits on the contributions to an ESOP that may be authorized by a board at any particular time. Such contributions are a form of compensation for which there must be adequate consideration. See Michelson v. Duncan, 407 A.2d 211, 217 (Del.1979). The limits on such compensation are found in the doctrine of waste, which calls upon courts to determine "whether 'what the corporation has received [in expected increased productivity is such] that no person of ordinary, sound business judgment would deem it worth that which the corporation has paid.' " Grobow, 539 A.2d at 189 (quoting Saxe, 184 A.2d at 610).
 
 
 69
 Contrary to appellees' assertions, moreover, the Plan did not foreshadow the transactions in question. The intent to transfer control to the ESOP was qualified in the Plan by the not-inconsequential words "hoped," "ultimately," and "may." There was thus no expression of an expectation that control would vest in the ESOP in less than three years or even that it would ever vest. Nor was there any fixed commitment by the Company with regard to future contributions. In the roughly thirty-five months between creation of the ESOP and the Rhodes/ESOP transaction--"long standing" being an exaggerated description--the Company had contributed a total of $140,000 and 10,000 shares of common stock. Given the relatively meager size of these contributions when compared to the $3,395,000 involved in the transactions before us and the gradual nature of the initial funding of the ESOP, there is no basis to presume that the challenged transactions were routine steps in an ongoing scheme. If anything, the transactions were sudden and unexpected events rather than long standing parts of an existing plan. Nor does there appear to have been any initial contemplation that the ESOP might seek a loan to acquire a control bloc. The amendment of the Plan to authorize such a loan was virtually simultaneous with the Rhodes/ESOP transaction.
 
 
 70
 To the extent that the Plan contained provisions contemplating a sudden transfer of control to the ESOP at great present and future cost to the Company, it must be found in the language quoted above concerning the transfer of the stock of the principal shareholders to the ESOP. Appellees emphasize this provision and the evidence that Mr. Rhodes personally hoped that his stock would be transferred to the ESOP.
 
 
 71
 The relevance of these facts is somewhat unclear. Of course, the purchase of some or all of a principal shareholder's stock at a premium may be necessary to transfer control to an ESOP. However, the business wisdom of the transfer of control is not enhanced by a statement in the Plan concerning particular shareholders or by the expression of personal expectations by such a shareholder. In any event, Rhodes was not committed to any plan to transfer his shares to the ESOP. According to the particularized allegations of the complaint, the Rhodes estate shopped the shares, found the highest firm price, and allowed the Company to meet that price on the condition that it also purchase the Lerner shares at a premium. This offer was accompanied by the threat--or statement of fact, according to one's viewpoint--that the estate would sell them to a bidder whom it would thereafter assist in gaining control. The Rhodes estate's request for a list of shareholders signaled a possible proxy solicitation and underlined its hardball stance.
 
 
 72
 Moreover, no business justification is offered for the Lerner transaction apart from the presumption of due care under Delaware law. The Rhodes/ESOP transaction had already vested effective control, 49.1 percent, in the ESOP, and even if greater than 50 percent of shares was thought to be necessary, that small amount--1 percent of total shares--could have been acquired far more cheaply than $670,000. Although costly to an already weakened company, retirement of the Lerner shares did nothing to increase the proportionate voice of other shareholders in light of control already having been vested in the ESOP. Nor did it on this record serve any other corporate purpose. Indeed, appellees offer no reason independent of the Rhodes/ESOP transaction for the acquisition of the Lerner shares, but the Lerner acquisition does not have even the claimed benefit of increased employee productivity. However, the particularized allegations of the amended complaint state that Largay, acting for the Rhodes estate, insisted on the purchase of the Lerner shares in order to avoid meritorious derivative litigation by the Lerner estate over the Rhodes/ESOP transaction. Such a use of corporate funds amounts to waste and a failure to reveal the true purpose of the Lerner transaction amounts to misrepresentation.
 
 
 73
 The waste issue thus comes down to whether, giving full measure to all of the presumptions favoring the decision of an independent board, the benefits of expected increases in productivity attendant to the vesting of control in the ESOP bear any reasonable relation to the costs of the transactions in question. We believe that the disproportion between the serious financial weakening of the Company and any reasonable expectation of increased productivity is so glaring that the transactions as alleged amounted to a gratuity of one-third of the assets to top management. We know of no presumption that would permit us without more to indulge in the belief that such a loss can be offset by increased productivity among top management. Applying the Aronson test, we conclude that, viewing these transactions as a whole, no reasonable person can doubt that the Company has been weakened financially; any reasonable person must conclude that there is more than a reasonable doubt as to whether increased productivity caused by vesting control in the ESOP can even begin to offset the financial harm to the corporation.
 
 
 74
 This conclusion is amply supported by the lack of Delaware decisions upholding compensation schemes or contributions to an ESOP that are even remotely close to the facts of the instant case with respect to the size of the contribution, financial impact on the company, or the lack of any business purpose except for employee productivity. In Shamrock Holdings, the Delaware Court of Chancery upheld the adoption of an ESOP by Polaroid that differed from the ESOP in the instant case in several critical respects. First, the Polaroid transaction resulted in the ESOP owning less than five percent of the outstanding shares of Polaroid, see 559 A.2d at 263, whereas the transactions here vested a majority of the Company's shares in the ESOP. Second, the Polaroid ESOP was funded by the employees, see id. at 271, whereas in the instant case the Company was the entire source of funds for the ESOP through a series of contributions. The fact that the Polaroid ESOP required judicial scrutiny indicates just how extraordinary the Rhodes/ESOP and Lerner transactions are.
 
 
 75
 In In re Anderson, Clayton Shareholders Litig., 519 A.2d 680 (Del.Ch.1986), the Chancery Court declined to enjoin a recapitalization that involved the creation of an ESOP. In that case, the company's management decided to sell a number of its wide-ranging businesses in order to concentrate on its core business. Management also had to address problems arising from the termination of some family trusts that held a sizeable bloc of shares. The termination of the trusts of course made the block of shares available for sale, creating the possibility of a takeover or of downward pressure on share price. See id. at 683. After considerable study, the company sold a number of its businesses for cash and acquired yet more cash through borrowing and the termination of overfunded pension plans. See id. at 685. The recapitalization involved creation of an ESOP to which 730,202 shares of stock then in the company's treasury were sold to the ESOP at $45 per share on terms that matched future contributions by the company, much as the "loan" repayments are offset by the future contributions in the present case. The ESOP gave its shares to a corporate shell that was then merged into the company. Existing shareholders, i.e. other than the ESOP, received most of the newly raised cash in a distribution of $37 per share and of new common stock. Because of the creation of the ESOP, the cash distribution received capital gains treatment. By the completion of the transaction, the shareholders held 75 percent of the company's stock while the ESOP held 25 percent. See id. at 682, 688.
 
 
 76
 Appellees place no reliance on Anderson, Clayton, and we address it only in the interest of completeness. Anderson, Clayton involved a genuine recapitalization that involved a substantial cash distribution to non-ESOP shareholders entitled to favorable tax treatment because of the ESOP's existence. Although the ESOP received 25 percent of the new company's shares, that company was considerably smaller than the original, which had been partially liquidated, the cash having been distributed to shareholders. In the instant matter, the Rhodes/ESOP and Lerner transactions cost the Company over one-third of its net worth and these transactions were, unlike Anderson, Clayton, not part of a larger business plan such as a recapitalization.
 
 
 77
 Delaware courts, moreover, have held that allegations concerning the grant of stock options to corporate officers stated a prima facie claim of waste under circumstances far less egregious than those of the instant case. See Michelson, 407 A.2d at 215-17 (corporate waste to reduce exercise price on options); Gottlieb v. Heyden Chemical Corp., 90 A.2d 660, 661-64 (Del.1952) (option to purchase 50,000 unissued shares at less than market value, but no transfer of control amounts to corporate waste); Rosenthal v. Burry Biscuit Corp., 60 A.2d 106, 107-10 (Del.Ch.1948) (corporate waste to give option to president and 11 percent shareholder to purchase an additional 50,000 shares at $6 per share where corporation had 400,000 outstanding shares trading at $7 per share).
 
 
 78
 Appellees rely principally upon Grobow. That case, however, involved a buy-out of a dissident shareholder's shares at a premium. See 539 A.2d at 184-85. It is well-established under Delaware law that such a premium can be lawfully paid, the elimination of dissidence that reduces efficiency being a proper business purpose. See id. at 189 (citing cases). Moreover, in Grobow, the company received, in addition to the shares, a number of covenants from the dissident shareholder, including an enforceable contract not to compete with a subsidiary of the company that was once owned by the shareholder and not to hire the subsidiary's employees away from the company. See id. at 184. Again, no such larger business purpose was served by the transactions in the instant matter.
 
 
 79
 Demand is thus excused under Delaware law because the particularized allegations of the complaint create a reasonable doubt as to whether the Directors exercised substantive care. We need not, therefore, address the closer, yet hardly indisputable, question of whether the board's procedures in reaching its decision were adequate.[4]
 
 
 80
 With respect to the Rhodes defendants' cross-appeal from the district court's failure to address their motion to dismiss the complaint against the estate, we dismiss for lack of jurisdiction. The district court has entered no order at all with regard to the motion to dismiss, and there is thus nothing to review. Treating the cross-appeal as a petition for a writ of mandamus, we deny the petition for self-evident reasons.
 
 
 81
 We reverse on the appeal and dismiss the cross-appeal.
 
 
 
 [1]
 Because the district court believed that the allegations of the complaint concerning the Rule 23.1 issue were insufficient, it entered judgment against plaintiffs without granting the motion to amend. Had the allegations regarding demand been sufficient, it would have been an abuse of discretion not to allow the amendment, including new allegations pertaining to the merits. See Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); S.S. Silberblatt, Inc. v. East Harlem Pilot Block, 608 F.2d 28, 42-43 (2d Cir.1979). The sufficiency of the allegations of the amended complaint thus are the issue before us on appeal. Because we reverse, the motion to amend the complaint should be granted upon the return of this matter to the district court
 
 
 [2]
 The damage suffered as a result of the allegedly misleading statements in the proxy materials, Annual Report and Forms 8-K and 10-K, which are the basis of the federal claims, was largely in the lost opportunity to secure an injunction against the Rhodes/ESOP and Lerner transactions based on a claim of waste under Delaware law. The complaint thus bases the federal claims on Judge Friendly's decision in Goldberg v. Meridor, 567 F.2d 209, 219-21 (2d Cir.1977), cert. denied, 431 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978), which held that a failure to disclose a breach of fiduciary duty is actionable under Section 10(b) notwithstanding Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), where timely disclosure would have enabled the plaintiffs to have obtained injunctive relief under state law. The validity of some of the federal claims are thus wholly dependent upon the validity of the state claims. Therefore, even if directors do examine the business sense of each legal theory separately--a most dubious proposition--they simply could not do so in the instant or similar matters
 
 
 [3]
 A principal alteration of substantive rights caused by the making of a demand under Delaware law relates to the second prong of the Aronson test, namely, whether the particularized allegations of the complaint state a breach of fiduciary obligation that would not be subject to the protection of the business judgment rule. Given Stotland and Spiegel, such allegations are not sufficient to allow the action to continue after a demand. In Stotland, had demand not been made, the plaintiffs could have argued that their complaint satisfied the second prong of Aronson by stating a prima facie claim of waste. Because the Stotland court found the derivative action to have been mooted by the demand, it necessarily held that the Aronson test was no longer relevant. Spiegel thus expressly stated that "when a board refuses a demand, the only issues to be examined are the good faith and reasonableness of its investigation." 571 A.2d at 777
 
 
 [4]
 We need not address appellees' contentions regarding the fairness of the respective prices paid for the Rhodes and Lerner shares. A gift of stock can be corporate waste even if the price paid by the corporation for the stock was fair