Burton R. ABRAMS, Richard N. Abrams, Rodney A. Abrams and Brian K. Abrams, Plaintiffs,

v.

Paul O. KOETHER, Natalie I. Koether, David B. Blanchard, Henry H. Porter, John Galuchie, Jr., Myron Gelbach, Jr., Michael Witte, Lloyd Klatzkin and Shamrock Associates, a Limited Partnership, Defendants,

v.

TEXAS AMERICAN ENERGY CORPORATION, Nominal Defendant.

Civ. A. No. 90–3082.

United States District Court, D. New Jersey.

May 29, 1991.

**240**

Peter L. Masnik, Kalikman and Masnik, Haddonfield, N.J., David Schachman, Sachnoff & Weaver, Ltd., Chicago, Ill.; Stanley R. Wolfe, Berger & Montague, P.C., Philadelphia, Pa., and Eldon Ham, Northbrook, Ill., for plaintiffs.

Philip Rosenbach, Rosenbach & Rosenbach, Livingston, N.J., Matthew E. Hoffman, Keck Mahin Cate and Koether, New York City, and James K. Meguerian, Keck, Mahin & Cate, Chicago, Ill., for defendants.

## OPINION

LECHNER, District Judge.

This is a shareholder derivative action brought by shareholder plaintiffs Burton R. Abrams, Richard N. Abrams, Rodney A. Abrams and Brian K. Abrams (collectively, the "Plaintiffs") against defendants Paul O. Koether ("P. Koether"), Natalie I. Koether ("N. Koether"), David B. Blanchard ("Blanchard"), Henry H. Porter ("Porter"), John Galuchie, Jr. ("Galuchie"), Myron Gelbach, Jr. ("Gelbach"), Michael Witte ("Witte"), Lloyd Klatzkin ("Klatzkin"), current and former directors of Texas American Energy Corporation ("TAE"), Shamrock Associates, a Limited Partnership ("Shamrock") (collectively, the "Defendants") and nominal defendant TAE. Jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332.

The Defendants now move for summary judgment on the complaint on the ground that this complaint (the "1990 Complaint") fails to meet the pleading requirements of Fed.R.Civ.P. 23.1.[1] For the reasons which follow, partial summary judgment is grant-

1. In support of their motion, the Defendants submitted: the Memorandum of Law of Individual Defendants in Support of Motion for Summary Judgment (the "Moving Brief"); the affidavit of David B. Blanchard (the "Blanchard Aff."), and exhibits attached thereto, including the 10 June 1988 letter from Burton Abrams to David Blanchard, attached as Exhibit 1 (the "10 June 1988 Abrams Letter to Blanchard"), the 11 July 1988 letter from David Blanchard to Burton Abrams, attached as Exhibit 2 (the "11 July 1988 Blanchard Letter to Abrams"), the 29 July 1988 letter from Burton Abrams to David Blanchard, attached as Exhibit 3 (the "29 July 1988 Abrams Letter to Blanchard"), the 2 August 1988 letter from David Blanchard to Burton Abrams, attached as Exhibit 4 (the "2 August 1988 Blanchard Letter to Abrams"), the 4 October 1988 letter from Eldon Ham to David Blanchard, attached as Exhibit 5 (the "4 October 1988 Ham Letter to Blanchard"), the 10 October 1988 letter from Natalie Koether to Eldon Ham, attached as Exhibit 6 (the "10 October 1988 Koether Letter to Ham"), the 14 October 1988 letter from Eldon Ham to Natalie Koether, attached as Exhibit 7, (the "14 October 1988 Ham Letter to Koether"), the 25 November 1988 letter from Eldon Ham to Natalie Koether, attached as Exhibit 8 (the "25 November 1988 Ham Letter to Koether"), the 8 August 1988 letter from Eldon Ham to David Blanchard, attached as Exhibit 9 (the "8 August 1988 Ham Letter to Blanchard"), to the complaint, dated 9 August 1988, of Burton R. Abrams and Virginia E. Abrams against Paul O. Koether, David B. Blanchard, Shamrock Associates, Texas American Energy Corporation and other unidentified officers and directors of Texas American Energy Corporation (the "1989 Complaint") and the order, dated 19 October 1989, of Judge Milton I. Shadur (the "19 October 1989 Order of Dismissal"); the affidavit of Robert J. Schechter (the "Schechter Aff.") and the Form 10–K of Texas American Energy Corporation filed with the Securities and Exchange Commission for fiscal year ending 31 December 1989, attached thereto (the "Form 10–K"); and the Defendants' Reply Memorandum of Law in Further Support of their Motion for Summary Judgment (the "Reply Brief").

In opposition to this motion, the Plaintiffs submitted: the Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment (the "Opposition Brief"), and exhibits attached thereto, including the complaint in this action, attached as Exhibit C (the "1990 Complaint"), the transcript of the 18 June 1990 proceedings before Judge Milton I. Shadur, attached as Exhibit E (the "18 June 1990 Transcript") and the affidavit of David Schachman submitted pursuant to Fed.R.Civ.P. 56(f), attached as Exhibit K (the "Rule 56(f) Affidavit").

ed and the 1990 Complaint is dismissed without prejudice under Fed.R.Civ.P. 23.1.

*Facts*

The Plaintiffs are Illinois residents who own shares of common stock of nominal defendant TAE. 1990 Complaint, ¶ 9. TAE is a Delaware corporation headquartered in Far Hills, New Jersey. 1990 Complaint, ¶ 10. It has over 7,000,000 shares of common stock outstanding which are publicly traded on NASDAQ. *Id.* Shamrock is a New Jersey limited partnership also headquartered in Far Hills, New Jersey. *Id.*, ¶ 11. Shamrock owns approximately thirty-five percent of TAE's outstanding common stock. *Id.*, ¶ 22.

The 1990 Complaint alleges that "[a]ll the [D]efendants are linked together by a host of familial, business and other ties . . .," and that they "are involved in a byzantine network of interlocking and overlapping business relationships." *Id.*, ¶¶ 11, 23. Of especial importance for the purposes of this motion are the allegations as to dual allegiances by members of the TAE board of directors. It appears from the 1990 Complaint that the board underwent a change in composition in 1989. Therefore, the allegations as to dual allegiances are described first as to the members of the board as it existed in 1986, when the wrongdoing alleged in the 1990 Complaint was begun, and then as to members of the board as it existed in 1989 after the change in the board's membership.

In 1986, the TAE board consisted of P. Koether, Blanchard, Porter, Gelbach and Witte.[2] Of these five directors, four are alleged to have had dual allegiances to both TAE and Shamrock. The 1990 Complaint alleges P. Koether has been Chairman of the board of directors of TAE since 1986 and at all relevant times has been a general

and limited partner of Shamrock. *Id.*, ¶ 12.[3] The 1990 Complaint alleges Blanchard has been a director and officer of TAE since 1986 and at all relevant times has been a general partner of Shamrock. *Id.*, ¶ 13. It alleges Gelbach was a director of TAE from 1986 to June 1989 and at all relevant times has been a general partner of Shamrock. *Id.*, ¶ 14. In addition, it alleges that Porter was a director of TAE from 1986 through 1989 and is a limited partner of Shamrock. *Id.*, ¶ 16. Witte, the fifth director on the board as it existed in 1986, is not alleged to have had any ties to Shamrock. However, he is alleged to have participated in the allegedly fraudulent 1986 takeover of TAE. *See Id.*, ¶¶ 31–38; *infra* at 7–8.

It appears that in 1989, the TAE board of directors underwent a partial change in composition. In that year, Galuchie and Klatzkin were appointed to the board to replace Gelbach and Porter. *Id.*, ¶¶ 15–17. Galuchie and Klatzkin are not alleged to have any ties to Shamrock. *See id.* However, Klatzkin is alleged to be a director and stockholder of Sun Equities Corp. ("Sun"). *Id.*, ¶ 24.[4] Sun has a subsidiary named Edudata. Edudata owned one hundred percent of the shares of T.R. Winston ("TRW"), a retail brokerage firm. *Id.* In addition, Klatzkin is alleged to have owned a controlling interest in the American Physicians Service Group, Inc. ("APSGI") with P. Koether and "affiliate companies of the Defendants." *Id.*, ¶ 27.[5] Klatzkin is alleged to have been on both sides of transactions between TAE and Sun and APSGI. *See id.*, ¶¶ 78, 82; *infra* at 11–12. Galuchie is alleged to be employed by an "affiliate of a general partner of Shamrock." *Id.*, ¶ 15. It is alleged that this affiliate received payment from TAE for services rendered by Galuchie. *Id.*, ¶ 15. In addition, Galuchie

---

**2.** It is inferred from the allegations of the 1990 Complaint that the TAE board of directors is comprised of five members. This inference is based on that fact that the members of the board identified in the 1990 Complaint both before and after the 1989 change in the board membership total five. In addition, the 1989 Complaint states the board consists of five members. *1989 Complaint*, ¶ 12.

**3.** The 1990 Complaint also alleges he is married to N. Koether. *Id.*

**4.** In addition, the 1990 Complaint alleges that P. Koether and N. Koether are also directors of Sun. *Id.*, ¶ 24.

**5.** The 1990 Complaint also alleges that at all relevant times, P. Koether and Blanchard have been directors of APSGI. *Id.*, ¶ 27.

is alleged to be both a director of Edudata and of TAE and to have been on both sides of a transaction by virtue of that fact. *Id.,* ¶ 24.

The 1990 Complaint alleges that prior to the time the Defendants gained control of TAE, TAE consisted of two companies: its wholly-owned subsidiary Texas American Oil Corporation, a Texas-based oil and gas company incorporated in Delaware, and a regulated public utility, Western Kentucky Gas ("Western Kentucky"), which distributed and sold natural gas to more than 139,000 customers in western and central Kentucky. *Id.,* ¶ 29. The 1990 Complaint alleges that TAE "had substantial operations and hundreds of employees." *Id.*

In 1986, defendants P. Koether, Blanchard, Galuchie, Gelbach, Porter, Witte and Shamrock, as well as Hecco Ventures ("Hecco"),[6] a California-based partnership which is not named as a defendant in the 1990 Complaint, allegedly mounted a successful hostile proxy fight for control of TAE under the rubric of the TAE Stockholders Protective Committee. *Id.,* ¶ 32. As stated, Blanchard, P. Koether, Gelbach, Porter and Witte were elected in 1986 to TAE's board of directors. *Id.,* ¶¶ 16, 38. N. Koether and her law firm became counsel to TAE. *Id.* The 1990 Complaint alleges that the Defendants now own a controlling interest in TAE through their respective ownership interests in Shamrock and their affiliates. *Id.,* ¶ 22.

The 1990 Complaint alleges the Defendants engaged in misconduct in acquiring TAE and mismanaged TAE and engaged in self-dealing since acquiring control. It alleges that as a result, TAE was converted from "a valuable, regulated public utility into a corporate shell" with "virtually no operations and only six employees." *Id.,* ¶¶ 3, 6. The 1990 Complaint alleges:

Plaintiffs bring this action derivatively to enable and require TAE to recover from [D]efendants the damages TAE has sustained as a result of [D]efendants' and others' unlawful, pervasive and continu-

ing plan, conspiracy or scheme to fraudulently seize control of TAE, convert its assets to cash and thereafter loot TAE for the benefit of defendants and their affiliates.

*Id.,* ¶ 7.

The 1990 Complaint alleges the unlawful activity by the Defendants commenced with their allegedly fraudulent takeover of TAE. According to the 1990 Complaint, the Defendants disseminated false and misleading proxy materials to TAE's stockholders in connection with their hostile proxy fight for control of TAE. *Id.,* ¶¶ 32–33. The 1990 Complaint lists the various ways in which the proxy materials were allegedly false or misleading and various material facts which were allegedly omitted. *See id.,* ¶ 34.

In addition, the 1990 Complaint alleges various transactions the Defendants engaged in on behalf of TAE were wrongful and the product of self-dealing. It alleges that between October and December 1987, the Defendants caused TAE to sell Western Kentucky, TAE's primary asset, to their own financial benefit and to TAE's detriment. *Id.,* ¶ 39. The 1990 Complaint alleges Western Kentucky was sold for approximately $61.5 million in cash, which was "more than sufficient to permit TAE to retire or restructure its approximately $13 million in bank debt." *Id.,* ¶ 40. The Defendants allegedly solicited the consent of TAE shareholders for the sale of Western Kentucky through false and misleading proxy statements. The 1990 Complaint lists the ways in which the proxy statements were false or misleading. *Id.,* ¶¶ 42–43.

The 1990 Complaint alleges that on 24 April 1987, the Defendants caused TAE to sell to Shamrock and Hecco 1,600,000 shares of TAE common stock for $1.25 per share when the stock was trading in the market at $1.44 per share. *Id.,* ¶ 50. It is alleged that on 18 May 1988, the Defendants caused TAE to purchase 972,000 shares of its own stock from Hecco at $2.50

---

**6.** The 1990 Complaint alleges Hecco now owns approximately eighteen percent of the outstanding shares of TAE. *Id.,* ¶ 22.

per share when the stock was trading in the market at approximately $1.62 per share. *Id.*, ¶ 52.

Plaintiffs complain the Defendants forced TAE to participate in a "greenmail" transaction for the benefit of Shamrock and at the expense of TAE (the "Prime Transaction"). The 1990 Complaint alleges that a group of the Defendants, including P. Koether, N. Koether, Blanchard, Gelbach and Shamrock, and others formulated a plan to gain control of a firm known as Prime Medical ("Prime"). *Id.*, ¶ 53. By February 1987, this group owned seventeen percent of Prime's stock. *Id.* On 30 June 1987, Prime agreed to buy back 1,142,150 shares of its stock for $5.10 per share when the stock was then trading at $4.00 per share, allegedly to induce the Defendants to cease their efforts to gain control of Prime (the "Buyout"). *Id.*, ¶¶ 54, 55. The transaction allegedly included the agreement that if the Buyout did not occur within a specified period of time, Shamrock would repurchase the shares from Prime at the same price, $5.10 per share. Prime's directors would then resign and be replaced by directors designated by the Defendants. *Id.*, ¶ 56. N. Koether, Blanchard and Gelbach, general partners of Shamrock, allegedly personally guaranteed to Prime Shamrock's obligation to repurchase Prime's shares if the Buyout did not occur. *Id.*, ¶ 57.

When the Buyout fell through, Prime allegedly exercised its right to require Shamrock to repurchase its shares. *Id.*, ¶ 60. It is also alleged that Shamrock avoided incurring the cost of the repurchase, however, by forcing TAE to purchase 1.2 million Prime shares from Shamrock at $5.10 per share. *Id.*, ¶ 63. Under this purchase agreement, TAE could "put" to Shamrock, or force Shamrock to buy back, the Prime shares between designated dates. *Id.*, ¶ 71. The 1990 Complaint further alleges that on 24 October 1988, the Defendants caused TAE to enter into an agreement which gave the appearance that

TAE was exercising the put. *Id.* It is contended that:

> In reality, however, instead of actually giving TAE's money back, [the D]efendants forced TAE to keep all of the Prime stock, and in fact, forced TAE to take even *more* Prime stock from Shamrock, the consideration for which was the purported termination of TAE's rights under the put of TAE's [Prime shares].

*Id.*, ¶ 73 (emphasis in original).

Additional grievances include that the Defendants filed suit against Prime on 31 October 1988 for fraudulently and negligently overstating Prime's earnings in order to induce Shamrock to purchase Prime shares. *Id.*, ¶ 69. The Plaintiffs complain that the "Defendants excluded TAE from any participation in [that] suit, despite the fact that TAE was the real party in interest." *Id.* In addition, the 1990 Complaint alleges the Defendants forced TAE to continue to acquire Prime stock. *Id.*, ¶ 77. On 11 October 1989, the Defendants allegedly caused TAE to sell its shares of Prime stock to APSGI at a loss. *Id.*, ¶¶ 27, 78. As stated, the 1990 Complaint alleges that at all relevant times, P. Koether and Blanchard were directors of APSGI and P. Koether and Klatzkin and affiliate companies of the Defendants owned a controlling interest in APSGI. *Id.*, ¶ 27.

The 1990 Complaint alleges additional self-dealing by the Defendants by stating that on 12 September 1989 the Defendants caused TAE to acquire one hundred percent of the stock of TRW from its parent, Edudata, a subsidiary of Sun. *Id.*, ¶¶ 82, 24.[7] As stated, P. Koether, N. Koether and Klatzkin are allegedly directors of Sun and Galuchie is allegedly a director of Edudata. *Id.*, ¶ 24. In addition, the 1990 Complaint alleges TAE has paid N. Koether and the law firm with which she is affiliated approximately $2 million in legal fees incurred in "documenting, restructuring or implementing the self-dealing transactions described herein." *Id.*, ¶ 83.

---

**7.** The 1990 Complaint does not indicate whether or how the purchase of the TRW stock was to

TAE's detriment.

Plaintiffs contend it would be futile to demand action of TAE's directors in response to the grievances contained therein because:

> [a]t all times relevant hereto, TAE's Board of Directors has been dominated and controlled by self-interested director defendants. At no time relevant hereto has a majority of TAE's Board of Directors been disinterested with respect to the transactions complained of.... The transactions complained of herein were authorized by and ratified by the director defendants, who were at all times relevant hereto acting in their own self-interest and for their own fraudulent, self-dealing personal benefit.

*Id.,* ¶ 91. Specifically, the 1990 Complaint states as the basis for its allegations of futility:

> (a) The Board of Directors of TAE has been, and is, comprised of a majority of directors who were and are directly and financially interested in the self-dealing transactions at issue;
>
> (b) The TAE Board is, and has been, dominated and controlled by one or more of defendants Koether, Blanchard, Gelbach, Galuchie, Porter, Witte [8] and Klatzkin, who have or had a direct financial stake in the self-dealing transactions complained of. Board decisions on most of the matters complained of herein, or all of them, were unanimous;
>
> (c) To obtain relief for the wrongs alleged herein would require defendants to sue: (1) themselves, (ii) entities such as Shamrock in which they have a financial stake, or (iii) their families (such as Koether's wife Natalie), friends and business associates, which they will not do;
>
> (d) The defendants and TAE's Board have repeatedly and relentlessly acted in their own self-interest, as set forth

herein, violating their duties of candor, loyalty and care, and there is no reason to suppose that they would now change their behavior;

> (e) The defendants enjoy in their capacities as directors of TAE a unique opportunity to enhance their own personal financial welfare which they are loath to relinquish or jeopardize; and
>
> (f) The transactions alleged herein are clearly not and could not possibly be the result of the exercise of reasonable business judgment.

*Id.,* ¶ 92.

The Defendants move for summary judgment on the ground that the Plaintiffs have previously made demand for legal action on Defendants with respect to the grievances set forth in the 1990 Complaint, that the previous demand was refused by the TAE board of directors and that the instant lawsuit is therefore foreclosed under Delaware law, the state of TAE's incorporation.[9] In support of their motion, the Defendants submit a series of letters written between June 1988 and August 1989.

Contrary to the representation of the Defendants, the letters written between June and August 1988 are not demands for legal action by the TAE Board of Directors but requests for information. On 10 June 1988, Burton Abrams wrote a letter to Blanchard in which he complained of fees paid to N. Koether's law firm and of the Prime stock purchase. The letter closed by Blanchard requesting answers to a list of ten questions concerning the Prime stock purchase. *See* 10 June 1988 Abrams Letter to Blanchard. On 11 July 1988, Blanchard wrote a letter to Burton Abrams in which he defended the Prime stock purchase by stating it was structured such that TAE would reap any gain resulting from the purchase and Shamrock would absorb any loss. *See* 11 July 1988 Blanch-

---

**8.** The 1990 Complaint contains no specific allegations as to how Witte had a financial stake in or a conflict of interest with respect to the challenged transactions.

**9.** Under Delaware law, a shareholder may not bring a derivative suit on behalf of a corporation where the shareholder previously made a demand on the board of directors for legal action and the demand was refused. The business judgment rule operates to protect the board's decision to refuse demand, unless the shareholder pleads with particularity that the decision to refuse demand was wrongful. *See infra* at 40–42.

ard Letter to Abrams. On 29 July 1988, Burton Abrams wrote a second letter to Blanchard in which he characterized the 11 July 1988 letter as a "rehash of the literature embodied in [the] previous proxy releases" and in which he requested additional information concerning the "Matrix deal." 29 July 1988 Abrams Letter to Blanchard. On 2 August 1988, Blanchard wrote a letter to Burton Abrams in which he stated he believed he answered the questions posed by Burton Abrams and in which he offered to meet with him for further discussion. *See* 2 August 1988 Blanchard Letter to Abrams.

On 4 October 1988, Eldon L. Ham ("Ham"), the attorney for Burton Abrams and other TAE shareholders, wrote a letter to Blanchard on behalf of such shareholders in which he made a formal demand for action "against certain officers and directors of TAE who profited directly [or] indirectly from the Prime transactions." (the "4 October 1988 Demand"). *See* 4 October 1988 Ham Letter to Blanchard. The letter complained that the price paid by TAE for Prime stock, $5.10 per share, was not economically justified. *Id.* It further complained that the resulting loss was not mitigated by the put option, given that even if the put option were exercised, TAE would not receive interest on its funds in Shamrock's control during the period preceding the exercise of the put option. *Id.* It continued:

> The various fees paid, exploited profits, interlocking directorates and other insiders, and other related conflicts or potential conflicts, appears [sic] to have interfered with the generally accepted business judgment rule, to the damage and detriment of TAE as set forth above. Further, the overwhelming size and timing of the transaction may itself be prima facie evidence of improper conduct, as no prudent investor would accept the TAE side of the transaction on an arm's length basis. We believe the corporation TAE may have a cause of action against various officers and directors who (a) approved the above transactions in whole or in part; or (b) knew of or should have known of, and failed to act to protect

TAE with respect to the above; or (c) who benefitted directly or indirectly on a personal basis from the various transactions.

*Id.* at 2. The letter closed with a demand for action within ten days from the date of the letter. *Id.* at 3.

On 10 October 1988, N. Koether wrote a letter to Ham on behalf of TAE's Board of Directors in response to the 4 October 1988 Demand. N. Koether attached a 4 October 1988 press release which stated that TAE was "negotiating with its principal stockholder Shamrock ... regarding TAE's ownership of shares of Prime" and that it expected "that any transaction with Shamrock would materially reduce the average cost per share of its Prime investment." *See* 10 October 1988 N. Koether Letter to Abrams. The letter stated that the 4 October 1988 Demand was unwarranted in light of the fact that, as stated in the attached press release, the Prime transaction was being restructured. *Id.*

On 14 October 1988, Ham wrote a letter to N. Koether in which he acknowledged receipt of the 10 October 1988 letter and in which he expressed the desire of Burton Abrams to meet with Blanchard. *See* 14 October 1988 Ham Letter to N. Koether. The letter stated: "We agree that such a meeting may be productive and in the best interests of all parties concerned." *Id.* A 25 November 1988 letter from Ham to N. Koether reflects that a meeting between Blanchard and Burton Abrams was scheduled for 30 December 1988. *See* 25 November 1988 Ham Letter to N. Koether.

On 8 August 1989, Ham wrote a letter to Blanchard in which he stated:

> We appreciated that TAE implemented a partial reversal of the Shamrock/Prime transaction as noted by the various correspondence and press releases in October of 1988. We believe there are still problems to be solved, and our telephone calls have not always been returned.
>
> As a courtesy, please find enclosed a copy of the [1989] Complaint which was filed in the Circuit Court of Cook County, Illinois. We have refrained from issuing

summons and obtaining formal service in hopes of resolving the matter in an expeditious, businesslike fashion. We would be happy to meet or cooperate in other [sic] reasonable manner in this regard. *See* 8 August 1989 Ham Letter to Blanchard. Ham attached to the letter a copy of a complaint which was filed on that same date in the Circuit Court of Cook County, Illinois (the "1989 Complaint") by Burton Abrams and Virginia Abrams against TAE, nominal plaintiff and defendant, Shamrock, P. Koether, Blanchard and "other unidentified officers and directors of Texas American Energy Corporation." *See* 1989 Complaint.

The 1989 Complaint focused exclusively on the Prime Transaction as an uneconomic transaction and as the product of self-dealing by the defendants named in that action. *Id.* It was alleged that two of the five TAE directors, P. Koether and Blanchard, were general partners of Shamrock and two, including P. Koether, were limited partners of Shamrock. It alleged that the majority of the TAE Board of Directors was therefore not independent on matters relating to Shamrock. *Id.*, ¶ 12. The Plaintiffs stated that demand had been made on TAE's board of directors relative to the grievances alleged therein, and that "since a reasonable time has passed for appropriate corporate action, Defendants have waived any rights thereto they may otherwise have had." *Id.*, ¶ 27. The 1989 Complaint further stated "no additional demand is necessary because the Defendants are dominant shareholders and are in control of the Board of TAE and such demand would be futile." *Id.*, ¶ 28.

The 1989 Complaint was removed to the United States District Court for the North-

ern District of Illinois on 5 September 1989. *See* Moving Brief at 8 n. 2; Opposition Brief at 4. It was then dismissed by order of Judge Milton I. Shadur, dated 19 October 1989, for lack of personal jurisdiction over the Defendants. *See* 19 October 1989 Order of Dismissal.

On 10 May 1990, the 1990 Complaint was filed in the Circuit Court of Cook County, Illinois. *See* 1990 Complaint, Opposition Brief at 5. It was removed to the United States District Court for the Northern District of Illinois. Moving Brief at 8 n. 2. It appears that the Defendants moved for dismissal of the 1990 Complaint on claim preclusion grounds, but that such motion was denied. Opposition Brief at 6–7.[10] It was then transferred to this court by mutual agreement of the parties pursuant to 28 U.S.C. § 1404(a) on 27 June 1990. *Id.;* Opposition Brief at 7. It appears discovery on the merits of the 1990 Complaint has not yet begun as it appears discovery was stayed by consent order, signed by Magistrate Judge Ronald J. Hedges and dated 7 March 1991, pending disposition of the instant motion for summary judgment. *See* 7 March 1991 Consent Order.

In support of summary judgment in their favor, the Defendants argue the 1990 Complaint is not verified as required by Fed.R. Civ.P. 23.1 and must therefore be dismissed. In addition, the Defendants argue the Plaintiffs may not maintain the 1990 Complaint because they have previously made demand on the Defendants for legal action relative to the allegations of the 1990 Complaint and that such demand was refused. The Defendants argue the 1990 Complaint should be dismissed because it fails to meet the pleading requirements of Fed.R.Civ.P. 23.1,[11] which require that a

---

**10.** In support of their representation as to the court's ruling on the motion to dismiss, the Plaintiffs submitted excerpts from the transcript of the court proceedings held on 18 June 1990. *See* 18 June 1990 Transcript. This excerpt does not address the court's ruling on the motion to dismiss, but rather sets forth the observation of the court that the 1990 Complaint is broader than the cause of action set forth in the 1989 Complaint and is therefore not a refiling of the same action for purposes of assignment to a judge. *See id.* However, the Defendants do not

dispute the Plaintiffs' representation that the motion to dismiss based on claim preclusion principles was denied.

**11.** Rule 23.1 provides in relevant part:

In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, *the complaint shall be verified* and shall allege (1) that the plaintiff was

complaint particularize the demands made on the corporation or the reasons for not making such demand prior to commencing a shareholder derivative action. Moving Brief at 11.

■ The Defendants then argue that given the Plaintiffs have made demand on the board, they are foreclosed under Delaware law from asserting they have no obligation to make demand as such demand would be futile. *Id.* at 11–12. In addition, the Defendants argue where, as here, demand is made on the board of directors and refused, Delaware law provides that the board's decision to refuse demand is protected except where such refusal is "wrongful." *Id.* at 13. The Defendants assert Delaware law additionally requires a shareholder to "allege facts with particularity" showing wrongfulness and the complaint must be dismissed as falling short of this standard. The Defendants further assert the Plaintiffs are not entitled to discovery to assist them in making such particularized allegations. *Id.* at 13, 14 n. 5.[12]

In opposition to the motion for summary judgment, the Plaintiffs assert the 1990 Complaint was initially filed in Illinois state court, where verification is not required. They assert that verification is not required under the circumstances but state: "To remove even the slightest doubt in this regard, ... plaintiffs will cure this technical defect should the Court decide that the [1990 C]omplaint must now be verified." Opposition Brief at 10 n. 4.

■ The Plaintiffs also assert the 4 October 1988 Demand is not relevant to the 1990 Complaint. They assert the 1990 Complaint alleges a broad scheme by the Defendants to use TAE for their own advantage and to TAE's detriment, in which the Prime stock purchase constitutes only one element. Opposition Brief at 11–18. They further assert the 1990 Complaint properly pleads futility as a basis for refraining from making demand on TAE's board of directors, and that making such demand was in fact futile as demonstrated by the Defendants' continued self-dealing following the 4 October 1988 Demand. Opposition Brief at 18–21. In addition, the Plaintiffs appear to argue that even if they had made demand, the 1990 Complaint sufficiently alleges that the board's refusal was wrongful because it alleges that in response to the Plaintiffs' demand the Defendants deceptively advised the Plaintiffs the Prime Transaction was being reversed, when it was not. Opposition Brief at 19–

---

a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law, and (2) that the action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have. *The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority ... and the reasons for the plaintiff's failure to obtain the action or for not making the effort.*

Fed.R.Civ.P. 23.1 (emphasis added).

**12.** In addition, as support for their assertion that the refusal was not wrongful, the Defendants submit the affidavit of Blanchard, in which he states that TAE's board of directors gave "serious thought and consideration" to the 4 October 1988 Demand. *See* Blanchard Aff. As support for their assertion that the Prime Transaction was the product of proper business judgment, they submit the affidavit of Robert J. Schechter, counsel for the Defendants, and the accompanying Form 10–K of TAE for fiscal year ended 31 December 1989 to show the Prime Transaction ultimately resulted in profit to TAE. *See* Schechter Aff.; Form 10–K.

However, a motion to dismiss a derivative complaint for failure to meet the requirements of Fed.R.Civ.P. 23.1 is determined by reviewing the sufficiency of the allegations of the complaint. *See infra* at 25–26. While the Defendants seek dismissal of the 1990 Complaint pursuant to Fed.R.Civ.P. 56, and while both the Plaintiffs and Defendants have made factual submissions in support of and in opposition to the motion, only the submissions relative to whether demand was previously made are considered. All other determinations are made exclusively by reviewing the allegations of the complaint to determine whether they satisfy the requirements of Fed. R.Civ.P. 23.1. This is appropriate in light of the fact that Fed.R.Civ.P. 23.1 is a rule governing pleadings and in light of the fact that discovery has been stayed pending disposition of the instant motion. The Blanchard affidavit, the Schechter affidavit and the Form 10–K are therefore not considered.

20.[13]

In reply, the Defendants add to their previous arguments the assertion that even if the claims contained in the 1990 Complaint are different from those contained in the 1989 Complaint, the Plaintiffs cannot now claim futility under Delaware law because they waived a futility argument by making the 4 October 1989 Demand. Reply Brief at 6–9. In addition, the Defendants argue that if, alternatively, such demand is not deemed a waiver of the futility argument with respect to the instant claims, and the Plaintiffs are not foreclosed from raising futility under Delaware law, the complaint does not plead futility with the requisite particularity. Reply Brief at 10–14.

*Discussion*

■ The Defendants move for summary judgment on the 1990 Complaint on the ground that it fails to meet the requirements of Fed.R.Civ.P. 23.1. However, as will be explained, Fed.R.Civ.P. 23.1 establishes the pleading standard by which the sufficiency of a shareholder derivative complaint is determined. *See infra* at 25–26. A dismissal pursuant to Fed.R.Civ.P. 23.1 does not, therefore, implicate the merits of the complaint but is only based on the sufficiency of the pleadings. The Defendant's motion to dismiss the 1990 Complaint is deemed a motion to dismiss pursuant to Fed.R.Civ.P. 23.1 *See Peller v. Southern Co.*, 911 F.2d 1532, 1536 (11th Cir.1990) (where both motions for dismissal pursuant to Fed.R.Civ.P. 12(b)(6) and, in the alternative, for summary judgment pursuant to Fed.R.Civ.P. 56 were brought, trial court correctly appropriately dismissed complaint not under Rules 12(b)(6) or 56, but under Rule 23.1).

In addition, submissions were made by the parties relative to the question of whether prior demand was made by the Plaintiffs with respect to the Prime Transaction. As stated, to the extent the submissions relate to issues other than whether prior demand was made, they are not considered. *See supra* n. 12. The Defendants motion for summary judgment is therefore treated not as a motion for summary judgment on the complaint in its entirety, but as a motion for partial summary judgment on the one discrete issue of whether prior demand was made by the Plaintiffs.

*1. Fed.R.Civ.P. 23.1 and Choice of Law*

Rule 23.1 of the Federal Rules of Civil Procedure requires that a plaintiff in a

---

**13.** The Plaintiffs additionally proffer the affidavit of David Schachman, counsel for the Plaintiffs, pursuant to Fed.R.Civ.P. 56(f). The Rule 56(f) affidavit states:

Pursuant to Rule 56(f), I believe that the documents requested in the production request previously served on defendants and depositions of the defendants and other parties involved in the transactions alleged in the [1990 C]omplaint will produce evidence presently unavailable to plaintiffs to establish the allegations of the complaint. The allegations of the complaint are based upon the Publicly Available Information....

Rule 56(f) Aff., ¶ 4. In order for a Rule 56(f) affidavit to state a valid request for a continuance of a motion for summary judgment pending further discovery, it must "identify with specificity 'what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained.'" *Lunderstadt v. Colafella*, 885 F.2d 66, 71 (3d Cir.1989) (quoting *Dowling v. City of Philadelphia*, 855 F.2d 136, 139–40 (3d Cir.1988)). *See also J.F. Feeser, Inc. v. Serv–A–Portion, Inc.*, 909 F.2d 1524, 1546 n. 2 (3d Cir.1990), *cert. denied,* —— U.S.

——, 111 S.Ct. 1313, 113 L.Ed.2d 246 59 U.S. L.W. 3636 (1991); *Radich v. Goode*, 886 F.2d 1391, 1393 (3d Cir.1989). The Rule 56(f) affidavit submitted by the Plaintiffs does not provide the information which must be included in a Rule 56(f) affidavit. It is therefore ineffectual as a basis for requesting a continuance of the instant motion pending discovery.

The Rule 56(f) affidavit submitted by the Plaintiffs does not provide a basis for continuing the instant motion for a second reason. Delaware law does not permit discovery to enable a plaintiff to plead facts in a derivative complaint demonstrating that demand was excused or that demand was wrongfully refused. *See Levine v. Smith*, 591 A.2d 194 (Del.Supr. 1991). The exception, not applicable here, is that a plaintiff is permitted to conduct discovery to ascertain the disinterestedness of an independent committee established by a board of directors following the filing of a derivative complaint. *Id.* (citing *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del.Supr.1981); *Aronson v. Lewis*, 473 A.2d 805 (Del.Supr. 1984)). The affidavit of Schachman is therefore not considered in determining the instant motion.

shareholder derivative action "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors ... and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Fed.R.Civ.P. 23.1. Rule 23.1 is a federal pleading standard which "speaks only to the adequacy of the shareholder representative's pleadings" in a shareholder derivative action. *Kamen v. Kemper Financial Services, Inc.,* — U.S. —, 111 S.Ct. 1711, 1713, 114 L.Ed.2d 152 (1991). *Cf. Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 799 (3d Cir. 1989) (federal procedural standards are applied in federal court, even though the underlying right upon which the action is based is derived from state law).

Rule 23.1 is a departure from the "notice" pleading philosophy of the Federal Rules of Civil Procedure and represents "a procedural resolution of the tension between the usual statutory directive that a Board of Directors conduct the affairs of a corporation and the power given to shareholders to remedy corporate directors' misfeasance, malfeasance and nonfeasance by instituting actions on behalf of the corporation." *Allison on Behalf of General Motors Corp. v. General Motors Corp.,* 604 F.Supp. 1106, 1112 (D.Del.1985), *aff'd without opinion,* 782 F.2d 1026 (3d Cir.1985). Whether a plaintiff has complied with Rule 23.1 is to be determined through an examination of the complaint. *Lewis v. Curtis,* 671 F.2d 779, 784 (3d Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982).

Rule 23.1 governs pleading only; it does not create the demand requirement. *Kamen v. Kemper Financial Services, Inc.,* — U.S. —, 111 S.Ct. 1711, 1713. "The purpose of the demand requirement is to 'afford the directors [of a corporation] the opportunity to exercise their reasonable business judgment and waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right.'" *Id.* (quoting *Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 533, 104 S.Ct. 831, 836, 78 L.Ed.2d 645 (1984)). The effect of making demand on the board of directors of a corporation is to place the decision in its hands as to whether to control and whether to continue the litigation. *Id.* That decision is insulated from judicial review by the business judgment rule, a substantive state rule intended to enforce the board's responsibility for operating the corporation while insulating it from liability for good faith mistakes. *RCM Securities Fund, Inc. v. Stanton,* 928 F.2d 1318, 1328 (2d Cir.1991).

The Supreme Court has held that the power of a board of directors to continue or to discontinue a cause of action brought on behalf of the corporation is governed by the state law, or the business judgment rule, of the state of incorporation. *See Kamen,* — U.S. at —, 111 S.Ct. at 1719; *Burks v. Lasker,* 441 U.S. 471, 486, 99 S.Ct. 1831, 1841, 60 L.Ed.2d 404 (1979). In diversity cases, the relevant substantive law is the law of the state of incorporation. *RCM Securities Fund, Inc.,* 928 F.2d at 1328. The parties agree that it is Delaware law which applies in the instant diversity action, given TAE was incorporated in Delaware. The relevant inquiry with respect to the instant motion for summary judgment is whether the complaint pleads with the particularity required by Fed.R.Civ.P. 23.1 facts demonstrating the Plaintiffs have met Delaware's demand requirements.

### 2. The Demand Requirement and the Business Judgment Rule

Under Delaware law, the directors of a corporation, not the shareholders, manage the business and affairs of a corporation. *Spiegel v. Buntrock,* 571 A.2d 767, 772–73 (Del.Supr.1990); *Pogostin v. Rice,* 480 A.2d 619, 624 (Del.Supr.1984); *Aronson v. Lewis,* 473 A.2d 805, 811 (Del. Supr.1984); *Zapata Corp. v. Maldonado,* 430 A.2d 779, 782 (Del.Supr.1981) (all citing 8 Del.C. § 141(a)). The management powers of directors include the decision-making power to commence or to refrain from commencing litigation on behalf of the corporation. *Spiegel,* 571 A.2d at 773; *Zapata,* 430 A.2d at 782. Accompanying the

management powers of the directors, including powers relative to litigation, are corresponding fiduciary duties to the corporation and to the corporation's shareholders. *Spiegel,* 571 A.2d at 773; *Pogostin,* 480 A.2d at 624; *Aronson,* 473 A.2d at 811. The nature of the shareholder derivative suit has been described as two-fold:

> First, it is the equivalent of a suit by the shareholders to compel the corporation to sue. Second, it is a suit by the corporation, asserted by the shareholders on its behalf, against those liable to it.

*Aronson,* 473 A.2d at 811. As such, the derivative action inherently "impinges on the managerial freedom of directors." *Spiegel,* 571 A.2d at 773 (quoting *Pogostin,* 480 A.2d at 624). *See also Kaplan v. Peat, Marwick, Mitchell & Co.,* 540 A.2d 726, 730 (Del.Supr.1988). The shareholder derivative suit "could, if unrestrained, undermine the basic principle of corporate governance that the decisions of a corporation—including the decision to initiate litigation—should be made by the board of directors or the majority of shareholders." *Kaplan,* 540 A.2d at 730 (quoting *Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 531, 104 S.Ct. 831, 836, 78 L.Ed.2d 645 (1984)).

■ Accordingly, Delaware's demand requirement, codified at Chancery Court Rule 23.1,[14] limits shareholder derivative actions by requiring that "shareholders seeking to assert a claim on behalf of the corporation must first exhaust intracorporate remedies by making a demand on the directors to obtain the action desired, or to plead with particularity why demand is excused." *Spiegel,* 571 A.2d at 773 (citing *Kaplan,* 540 A.2d at 730).[15] The purpose of the demand requirement of Chancery Rule 23.1 is to afford "the corporation the opportunity to address an alleged wrong without litigation, to decide whether to invest the resources of the corporation in litigation, and to control any litigation which does occur." *Spiegel,* 571 A.2d at 773. "[B]y promoting this form of alternative dispute resolution, rather than immediate recourse to litigation, the demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of a corporation." *Aronson,* 473 A.2d at 812. *See also Kaplan,* 540 A.2d at 730; *Pogostin,* 480 A.2d at 624.

■ The Delaware supreme court has observed:

> The function of the business judgment rule is of paramount significance in the context of a derivative action. It comes into play in several ways—in addressing a demand, in the determination of demand futility, in efforts by independent disinterested directors to dismiss the action as inimical to the corporation's best interests, and generally, as a defense to the merits of the suit.

*Aronson,* 473 A.2d at 812. The business judgment rule is defined as the "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the

---

**14.** Chancery Court Rule 23.1, which is similar to Fed.R.Civ.P. 23.1, provides in relevant part:

> In a derivative action brought by 1 or more shareholders or members to enforce a right of a corporation or of an incorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall allege that the plaintiff was a shareholder or member at the time of the transaction of which he complains or that his share of membership thereafter devolved on him by operation of law. *The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desired from the directors or comparable authority and the reasons for his failure to obtain the action or for not making the effort.*

Del.Ch. R. 23.1 (emphasis added).

**15.** While it sets forth pleading requirements, Chancery Rule 23.1 in effect restricts shareholder derivative actions. Its requirements are therefore "more than mere formalities of litigation but strictures of substantive law." *Tandycrafts, Inc. v. Initio Partners,* 562 A.2d 1162, 1166 (Del.Supr.1989). As a substantive rule, Chancery Rule 23.1 is applied by federal courts sitting in diversity to evaluate the sufficiency of a complaint's allegations of demand on a motion to dismiss based on Fed.R.Civ.P. 23.1. *See, e.g., R.C.M. Securities Fund, Inc.,* 928 F.2d at 1329; *In re General Motors Class E Stock Buyout Securities Litigation,* 694 F.Supp. 1119 (D.Del.1988); *Allison on Behalf of General Motors Corp.,* 604 F.Supp. at 1106; *Tabas v. Mullane,* 608 F.Supp. 759 (D.N.J.1985).

best interests of the company." *Id.* (citing *Kaplan v. Centex Corp.*, 284 A.2d 119, 124 (Del.Ch.1971)). Where the directors of a corporation decide litigation is not in the interests of the corporation, the shareholder is foreclosed from initiating such litigation because the shareholder "lacks the legal managerial power to ... [engage in] the litigation." *Aronson*, 473 A.2d at 813. The shareholder may initiate a derivative lawsuit only where the business judgment rule does not protect the decision of the directors against commencing litigation. *Id.* The burden is on the shareholder-plaintiff to establish facts rebutting the presumption of the business judgment rule. *Spiegel*, 571 A.2d at 774; *Aronson*, 473 A.2d at 812.

 The protection of the business judgment rule does not extend to an interested director. An interested director is a director who derives financial benefit from a transaction not devolving on shareholders of the corporation generally or who has divided loyalties. *Pogostin*, 480 A.2d at 624. In addition, the protection of the business judgment rule cannot be claimed by a director who violated the duty of care to the corporation. *Aronson*, 473 A.2d at 812. A director violates the duty of procedural due care to a corporation and its shareholders when the director makes uninformed or nondeliberated decisions on behalf of the corporation. *Grobow v. Perot*, 539 A.2d 180, 189 (Del.Supr.1988); *Smith v. Van Gorkom*, 488 A.2d 858, 873 (Del. Supr.1985); *Aronson*, 473 A.2d at 812. In addition, a director violates the duty of substantive due care where the terms of a transaction approved by the director on behalf of the corporation are "so inadequate ... that no person of ordinary, sound business judgment" would assent to them. *Grobow*, 539 A.2d at 189.

 Delaware law requires that in cases in which demand has been made and refused ("demand refused" cases), a complaint must plead with particularity that demand was made and wrongfully refused so as to create a reasonable doubt that the refusal is protected by the business judgment rule. *Levine*, 591 A.2d at 210; *Spie-*

*gel*, 571 A.2d at 773–75. *See infra* at 255–256. Alternatively, in cases in which demand has not been made, demand is excused as futile if the complaint pleads with particularity facts creating a reasonable doubt that the board is disinterested or that the challenged transactions are otherwise protected by the business judgment rule. *Kaplan*, 540 A.2d at 731. *See infra* at 256–257.

### 3. *Partial Summary Judgment on the Issue of Prior Demand*

As stated, the motion of the Defendants for summary judgment is treated as a motion for summary judgment on the issue of whether prior demand was made by the Plaintiffs. For the reasons which follow, it is determined that the Plaintiffs have created no factual dispute with respect to the fact that the 4 October 1988 Demand was made and with respect to the fact that the 4 October 1988 Demand contains the same allegations concerning the Prime Transaction as are contained in the 1990 Complaint.

### a. *Standard of Review*

To prevail on a motion for summary judgment, the moving party must establish there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The district court's task is to determine whether disputed issues of fact exist, but the court cannot resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). *See also Todaro v. Bowman*, 872 F.2d 43 (3d Cir.1989); *Joseph v. Hess Oil*, 867 F.2d 179, 182 (3d Cir.1989).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking

summary judgment has pointed out to the court the absence of a fact issue,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

*Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1356 (emphasis in original, citations and footnotes omitted).

The court elaborated on the standard in *Anderson:* "If the evidence [submitted by a party opposing summary judgment] is merely colorable ... or is not significantly probative ... summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). The Supreme Court went on to note in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323–24, 106 S.Ct. at 2553 (footnote omitted). Thus, once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing the need for trial. *See* Fed.R.Civ.P. 56(e). *See also Aronow Roofing Co. v. Gilbane Building Co.,* 902 F.2d 1127, 1128 (3d Cir.1990) ("summary judgment will be granted where the non-moving party fails to 'establish the existence' of an element essential to the case.").

b. *The 4 October 1988 Demand and the 1990 Complaint*

In support of their motion for summary judgment, the Defendants argue that the 4 October 1988 Demand and the letters of Burton Abrams which preceded the demand addressed all the concerns raised in the 1990 Complaint. In opposition to the motion for summary judgment, the Plaintiffs do not contest that they had previously made *a* demand for legal action on the TAE board. Rather, they argue that the 1990 Complaint contains allegations which expand on the grievances expressed in the 4 October 1988 Demand, rendering the allegations of the 1990 Complaint altogether different from those contained in the 4 October 1988 Demand. In addition, they argue that the decision of Judge Shadur denying the Defendants' motion to dismiss the 1990 Complaint on claim preclusion grounds mandates a finding that the 1990 Complaint is altogether different in substance from the 4 October 1988 Demand under the doctrine of the law of the case.

A comparison of the 1990 Complaint and the 4 October 1988 Demand reveals both the position of the Defendants and the position of the Plaintiffs to be disingenuous. As to the contentions of the Defendants, it has previously been observed that the letters sent to the TAE board prior to the 4 October 1988 Demand do not appear to be demand letters. The 4 October 1988 Demand was the only demand for legal action issued by the Plaintiffs. That demand is addressed to concerns of the Plaintiffs regarding the Prime Transaction. The 1990 Complaint, on the other hand, addresses the Plaintiffs' concerns regarding the Prime Transaction but adds concerns regarding unrelated transactions and alleged fraud by the Defendants contained in various proxy statements. The concerns raised in the 4 October 1988 Demand and the concerns expressed in the 1990 Complaint are not identical and coextensive in all respects, as urged by the Defendants.

■ In addition, the 1990 Complaint and the 4 October 1988 Demand are not altogether different, as urged by the Plaintiffs. The Plaintiffs attempt to distinguish the 4 October 1988 Demand from the 1990 Complaint by arguing that the 1990 Complaint alleges the Prime Transaction to be part of a broader scheme than that alleged in the 4 October 1988 Demand. However, such an argument merely suggests that the 1990 Complaint adds new allegations which have come to light since the 4 Octo-

ber 1988 Demand was made. The core of the allegations of the 1990 Complaint relative to the Prime Transaction are that such transaction was not economically justified in light of the price paid for the Prime shares and in light of the lack of interest received by TAE from Shamrock for the period during which TAE funds were within Shamrock's control. These allegations are identical to the allegations contained in the 4 October 1988 Demand; the concerns raised in the 1990 Complaint are not distinguishable from those raised in the 4 October 1988 Demand. It therefore appears that demand has been made with respect to the allegations in the 1990 Complaint regarding the Prime Transaction. The submissions of the Plaintiffs do not raise a genuine issue of material fact on this point. The law of the case doctrine does not require a contrary result.

The Plaintiffs assert that Judge Shadur denied the Defendants' motion to dismiss the 1990 Complaint, which was brought on claim preclusion grounds, based on his finding that the 1990 Complaint is not identical to the 1989 Complaint. They further assert this ruling is dispositive of their argument that demand was not made with respect to the allegations contained in the 1990 Complaint. It is true that the 1989 Complaint contains essentially the same allegations as set forth in the 4 October 1989 Demand. Based on the similarity between the 4 October 1988 Demand and the 1989 Complaint, the Plaintiffs appear to argue that Judge Shadur's ruling with respect to a comparison of the 1990 Complaint and the 1989 Complaint encompasses by inference a determination that the 1990 Complaint is not identical to the 4 October 1988 Demand.

It does not appear, however, from the submissions of the parties that Judge Shadur ever compared the 4 October 1988 Demand and the 1989 Complaint to determine whether the 4 October 1988 Demand constituted previous demand as to the allegations of the 1989 Complaint. In addition, as stated previously, the transcript excerpt submitted by the Plaintiffs of the 18 June 1990 proceedings before Judge Shadur merely reflects Judge Shadur's determination that

the 1989 Complaint and the 1990 Complaint are not identical for purposes of assignment to a judge. See 18 June 1990 Transcript. It does not reflect, as asserted by the Plaintiffs, Judge Shadur's denial of the motion to dismiss on the ground that the 1990 Complaint and 1989 Complaint are not the same complaints under claim preclusion principles.

In addition, even if the Plaintiffs' representation as to the content of the 18 June 1990 Transcript is accurate, their characterization of Judge Shadur's ruling is incorrect. Based on the excerpt of the 18 June 1990 proceedings before Judge Shadur submitted by the Plaintiffs, it does not appear Judge Shadur ruled the 1989 and 1990 Complaints are entirely different. Rather, it appears he merely determined that the 1990 Complaint contains allegations in addition to those in the 1989 Complaint, rendering the 1990 Complaint an expanded version of the 1989 Complaint. See 18 June 1990 Transcript. The Plaintiffs have not demonstrated that the denial by Judge Shadur of the Defendant's motion to dismiss based on claim preclusion principles requires a finding that demand was not made as to the 1990 Complaint.

It appears that demand has previously been made on the TAE directors with respect to the events related to the Prime Transaction which are alleged in the 4 October 1988 Demand. Because the Plaintiffs have not created a genuine issue of material fact concerning the fact that prior demand was made with respect to the allegations of the 1990 Complaint concerning the Prime Transaction, summary judgment is granted on the issue concerning the existence of prior demand. The question of whether the 1990 Complaint meets the pleading requirements of Rule 23.1 with respect to the allegations concerning the Prime Transaction is therefore determined with reference to the analysis employed in cases in which demand has been made and refused.

There does not appear to be a genuine issue of material fact that demand has not been made with respect to the other transactions challenged in the 1990 Complaint.

Therefore, partial summary judgment is entered on the lack of prior demand as to the allegations of the 1990 Complaint other than those concerning the Prime Transaction. The question of whether the 1990 Complaint meets the pleading requirements of Rule 23.1 with respect to the allegations other than the allegations concerning the Prime Transaction is therefore determined with reference to the analysis employed in demand futility cases.

### 4. The Prime Transaction—Demand Refused

As stated previously, when a shareholder makes a demand for legal action on the board of directors prior to initiating a derivative action, the shareholder has in effect placed control of the derivative action in the hands of the board of directors. *Spiegel*, 571 A.2d at 775 (citing *Zapata*, 430 A.2d at 784–86). Courts apply the business judgment rule in evaluating the propriety of a board's decision to refuse demand. *Id.* at 774.

Decisions of the directors of a corporation, including the decision to refuse demand, are protected by the business judgment rule's presumption that such decisions are made "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson*, 473 A.2d at 812. The burden is on the plaintiff to overcome the presumption that the refusal of demand is protected by the business judgment rule. In order to overcome this presumption, the complaint must plead with particularity facts creating a reasonable doubt that the refusal was made in an informed manner and in good faith by disinterested directors. *Levine*, 591 A.2d at 210 (citing *Spiegel*, 571 A.2d at 773–75; *Aronson*, 473 A.2d at 808; *Grobow*, 539 A.2d at 186). This "reasonable doubt standard in conjunction with the particularity requirement of Rule 23.1 strikes the essential balance between avoiding abuse of the derivative action and forcing a plaintiff to plead evidence without the benefit of discovery." *Pogostin v. Rice*, 480 A.2d 619, 625 (Del.Supr.1984).

In a recent decision, the Delaware supreme court announced that where a shareholder makes a demand for legal action on a board of directors, that shareholder "tacitly concedes the independence of a majority of the board to respond. Therefore, when a board refuses a demand, the only issues to be examined are the good faith and reasonableness of its investigation." *Spiegel*, 571 A.2d at 777. Where the plaintiff does not plead facts with particularity creating such a reasonable doubt, the board's decision to refuse demand is respected by the courts and the board's motion to dismiss the derivative action is granted. *Id.*

The Delaware supreme court also announced in *Spiegel* that a shareholder who makes demand on a board of directors cannot later claim that demand was futile. *Id.* at 775. As the Delaware supreme court stated:

> By making a demand, a stockholder tacitly acknowledges the absence of facts to support a finding of futility. Thus, when a demand is made, the question of whether demand was excused is moot.... The effect of making demand is to place control of the derivative action in the hands of the board of directors. Consequently, stockholders who ... make a demand which is refused, subject the board's decision to judicial review according to the traditional business judgment.

*Id.* at 775–76 (citations omitted).

As stated, it appears that by issuing the 4 October 1988 Demand, the Plaintiffs made demand on the TAE board with respect to the allegations of the 1990 Complaint pertaining to the Prime Transaction. Under *Spiegel*, the disinterestedness of the TAE board, as it was composed on 4 October 1988 when the demand was made, was conceded by the Plaintiffs by virtue of their having made such demand. *Spiegel*, 571 A.2d at 775–76. Therefore, all that must be determined is whether the allegations of the 1990 Complaint contain particularized facts casting a reasonable doubt on the reasonableness and good faith of the TAE board's investigation into the 4 October 1988 Demand. Only if the 1990 Com-

plaint contains such particularized allegations will the protection otherwise afforded to the TAE board's refusal of demand by the business judgment rule be overcome.

The Defendants correctly point out that the 1990 Complaint is bereft of any mention that demand had previously been made. It is obvious, therefore, given the 1990 Complaint makes no allusions to the demand, that the 1990 Complaint likewise contains no allegations stating the TAE board's investigation into the demand was not reasonable or was not made in good faith. The 1990 Complaint fails to plead with particularity that demand was made and wrongfully refused, as required under Delaware law and Fed.R.Civ.P. 23.1.

Rather than concede that demand was made with respect to the Prime Transaction, the 1990 Complaint alleges that demand was futile because the TAE board of directors was not disinterested. 1990 Complaint, ¶¶ 91–92. As has been stated, the Plaintiffs are foreclosed under Delaware law from raising the futility argument with respect to the Prime Transaction because they conceded the absence of futility of making demand on the board as it was then composed by making the 4 October 1988 Demand. *Spiegel,* 571 A.2d at 775–76.

Because the Plaintiffs have failed to create a genuine issue of material fact as to their previous demand with respect to the Prime Transaction, and because the 1990 Complaint fails to plead with particularity that demand was made and wrongfully refused as required by Chancery Rule 23.1 and Fed.R.Civ.P. 23.1, the allegations and causes of action concerning the Prime Transaction in the 1990 Complaint are dismissed under Fed.R.Civ.P. 23.1.

### 5. *Other Transactions—Demand Futility*

■ It is well-established under Delaware law that "where officers and directors are under an influence which sterilizes their discretion, they cannot be considered proper persons to conduct litigation on behalf of the corporation. Thus demand would be futile." *Aronson,* 473 A.2d at 814; *Tabas,* 608 F.Supp. at 766. Delaware

law provides that demand is not excused as futile unless a complaint pleads with particularity facts which create a reasonable doubt that: (1) the directors are disinterested and independent or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment. *Kaplan,* 540 A.2d at 731; *Grobow,* 539 A.2d at 186; *Aronson,* 473 A.2d at 815; *R.C.M. Securities Fund, Inc.,* 928 F.2d at 1329. Demand futility is determined as of the time the complaint was filed. *Aronson,* 473 A.2d at 810; *Harris v. Carter,* 582 A.2d 222, 229 (Del.Ch.1990); *Vanderbilt v. Geo–Energy Ltd.,* 725 F.2d 204, 211–12 (3d Cir.1983); *Cramer v. General Telephone & Electronics Corp.,* 582 F.2d 259, 276 (3d Cir.1978), *cert. denied,* 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979).

Where the allegations of a complaint create a reasonable doubt as to the disinterestedness of the directors under the first part of the test, demand is excused and it is unnecessary to proceed to the second part of the test. *Aronson,* 473 A.2d at 815. The allegations in the 1990 Complaint as to futility focus primarily on assertions concerning a lack of disinterestedness by a majority of the board. Whether the 1990 Complaint meets the first part of the futility test is therefore discussed first.

■ With respect to the first part of the test, a plaintiff pleads facts creating a reasonable doubt that the directors are disinterested and independent where the complaint alleges that a majority of the board is not disinterested. *Aronson,* 473 A.2d at 815 (citing *Bergstein v. Texas Intern'l Co.,* 453 A.2d 467, 471 (Del.Ch.1982)). Directors are self-interested where they appear on " 'both sides of the transaction, or ... [derive] any personal financial benefit from it which did not devolve upon the shareholders generally.' " *In re General Motors Class E Stock Buyout Securities Litigation,* 694 F.Supp. at 1132 (quoting *Ivanhoe Partners v. Newmont Mining Corp.,* 535 A.2d 1334, 1341 (Del.Supr.1987)). In addition, "[d]irectorial interest exists whenever divided loyalties are present...." *Pogostin,* 480 A.2d at 619.

Conclusory allegations that the board is controlled or dominated by an interested member are insufficient to create the requisite reasonable doubt that the board is disinterested. *Aronson*, 473 A.2d at 815–16 ("The shorthand shibboleth of 'dominated and controlled directors' is insufficient" to create the requisite reasonable doubt); *Lewis*, 671 F.2d at 785. In addition, the "bootstrap" argument that demand is excused because the directors would otherwise have to sue themselves is ineffectual in creating the requisite reasonable doubt. *Aronson*, 473 A.2d at 818; *Pogostin*, 480 A.2d at 625; *Allison on Behalf of General Motors Corp.*, 604 F.Supp. at 1114. Moreover, mere approval of the allegedly injurious transaction does not incapacitate a board for purposes of considering a demand under demand futility analysis. *Lewis*, 671 F.2d at 785.

Applying these principles to this case, the allegations of the 1990 Complaint—that demand is futile because the alleged wrongful transactions were ratified by the director defendants—will not suffice to cast a reasonable doubt on the capacity of the TAE board to consider a demand. *Lewis*, 671 F.2d at 785. In addition, the allegations of the 1990 Complaint that the TAE board is "dominated and controlled by one or more of defendants Koether, Blanchard, Gelbach, Galuchie, Porter, Witte and Klatzkin," 1990 Complaint, ¶ 92(b), are insufficient to create the requisite reasonable doubt, because these allegations are unaccompanied by particularized factual allegations explaining the nature of the domination or control. *Aronson*, 473 A.2d at 815–16; *Lewis*, 671 F.2d at 785. In addition, the "bootstrap" allegations that making demand is futile because it would call on the Defendants to sue themselves, as well as the allegations that making demand would call on the Defendants to sue their friends, family and business associates, 1990 Complaint, ¶ 92(c), are insufficient. *Aronson*, 473 A.2d at 818; *Pogostin*, 480 A.2d at 625; *Mozes on Behalf of General Electric Co. v. Welch*, 638 F.Supp. 215, 219–20 (D.Conn.1986); *Allison on Behalf of General Motors Corp.*, 604 F.Supp. at 1114.

Under the governing case law, the allegation which suffices to cast a reasonable doubt on the capacity of the board to consider demand is the allegation that a majority of the board is "directly and financially interested in the self-dealing transactions at issue." 1990 Complaint, ¶ 92(a). *See Aronson*, 473 A.2d at 815. In order to ascertain whether this basis for claiming futility is alleged with sufficient particularity, it is necessary to review the allegations as to the composition of the board as it existed in 1990 when the 1990 Complaint was filed to determine whether the specific allegations as to each member support the allegation that a majority is not disinterested.

As stated previously, the allegations of the 1990 Complaint indicate the composition of the board changed in 1989, after the 4 October 1988 Demand was made. Prior to that change, it appears the board consisted of P. Koether, Blanchard, Gelbach, Porter and Witte. Four of these five directors, P. Koether, Blanchard, Gelbach and Porter, are alleged to have been general or limited partners of Shamrock while serving on the TAE Board. Witte is not alleged to have had dual allegiances such as would render transactions approved by him on behalf of TAE self-dealing transactions.

In 1989, a year before the 1990 Complaint was filed, Gelbach and Porter terminated their membership on the TAE board and Galuchie and Klatzkin joined the board. P. Koether, Blanchard and Witte, who comprised a majority of the board when demand was made on 4 October 1988, remained on the board. Thus, it appears the board consisted of P. Koether, Blanchard, Witte, Galuchie and Klatzkin when the 1990 Complaint was filed. Galuchie is alleged to have engaged in self-dealing transactions in his dual capacities as director of TAE and as a director of Edudata and as the employee of an affiliate of a general partner of Shamrock. Klatzkin is alleged to have engaged in self-dealing transactions in his dual capacities as director of TAE and as the owner, with P. Koether and "affiliate companies of the Defen-

dants," 1990 Complaint, ¶ 27, of a controlling interest in APSGI and as a director and stockholder of Sun.

As stated, the Plaintiffs made demand on the TAE board of directors with respect to the Prime Transaction and thereby conceded the disinterestedness of a majority of the board as it existed at the time the 4 October 1988 Demand was made by doing so. A majority of the five members of the present board, P. Koether, Blanchard and Witte, were on the board when demand was previously made in 1988. However, this fact does not lead to the conclusion that the Plaintiffs conceded disinterestedness as to a majority of the present board because they conceded disinterestedness as to a majority of the prior board.

■ The composition of the board changed in the two intervening years between when demand was made in 1988 and when the 1990 Complaint was filed in 1990. As stated, futility is determined as of the time the 1990 Complaint was filed. It would be inequitable to charge the Plaintiffs with having conceded the disinterestedness of a majority of the members of the present board given there is at present no way to ascertain as to which members of the prior board disinterestedness was conceded. Stated in other terms, there is no way to ascertain whether the three members of the present board who were on the prior board, P. Koether, Blanchard and Witte, were the majority as to which disinterestedness was conceded when the 4 October 1988 Demand was made. It does not appear that the *Spiegel* waiver rule, only announced one year ago, has ever been applied where there has been a change in the membership of the board between

when demand was made and the derivative action filed.[16] In light of the circumstances present in this case, it would not be logical to extend the *Spiegel* waiver rule to find the Plaintiffs conceded disinterestedness of a majority of the present board by making demand on the prior board.

■ As to the five members of the present board, four, P. Koether, Blanchard, Galuchie and Klatzkin, are alleged to have engaged in self-dealing transactions in their dual capacities as directors of TAE and as partners or directors of other companies with which TAE did business. These particularized facts sufficiently substantiate the allegation of the 1990 Complaint that a majority of the TAE board, as it existed when the 1990 Complaint was filed, was not disinterested. Because the 1990 Complaint adequately pleads that demand was excused under the first part of the demand futility analysis, it is unnecessary to proceed to the second step in the analysis.

For the foregoing reasons, the 1990 Complaint pleads facts with sufficient particularity which cast a reasonable doubt on the capacity of the board to consider demand and which substantiate the claim that demand was excused as to the transactions not encompassed by the 4 October 1988 Demand. The 1990 Complaint does not fall short of the pleading standard set forth under Delaware law and under Fed.R. Civ.P. 23.1 insofar as transactions other than the Prime Transaction are alleged.

### 6. *Verification*

As stated, federal pleading rules are applied in federal court, even where the un-

---

**16.** In fact, in *Spiegel,* the Delaware supreme court announced for the first time the waiver rule on facts very different from those present in the instant case. In *Spiegel,* the shareholder-plaintiff filed a derivative action and the defendants moved for dismissal for failure to make demand. The plaintiff then made demand on the board of directors and argued in opposition to the motion for dismissal that the defendants' argument was mooted by his having made demand. The supreme court ruled the plaintiff conceded the disinterestedness of a majority of the board for purposes of evaluating whether demand was wrongfully refused by virtue of

having made demand after the derivative action was filed. *Spiegel,* 571 A.2d at 771–72, 775. *See also Levine,* 591 A.2d 194 (Del.Supr. 9 April 1991) (the plaintiff conceded the disinterestedness of the board where demand was made and the lawsuit filed approximately two months later; no intervening change in the board was alleged); *Mount Moriah Cemetery v. Moritz,* 1991 WL 50149 (Del.Ch. 4 April 1991) (the plaintiff conceded the disinterestedness of the board where demand was made and the lawsuit filed approximately one year later; no intervening change in the board was alleged).

derlying right upon which the action is based is derived from state law. *Cf. Instant Air Freight Co.*, 882 F.2d at 799. Thus, the verification rule of Fed.R.Civ.P. 23.1, which requires that a derivative complaint be verified, applies in the instant case. *See,* Fed.R.Civ.P. 23.1.

"Before a court can proceed with a derivative suit, it must be assured that the plaintiff or some other person has investigated the charges and found them to have substance." *Lewis,* 671 F.2d at 787 (quoting *Porte v. Home Federal Savings & Loan Ass'n,* 409 F.Supp. 752, 754 (N.D.Ill.1976)). The verification requirement serves as a means of "discourag[ing] 'strike suits' by people who might be interested in getting quick dollars by making charges without regard to their truth so as to coerce corporate managers to settle worthless claims in order to get rid of them." *Id.* (quoting *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 371, 86 S.Ct. 845, 850, 15 L.Ed.2d 807 (1966)). Failure to verify the complaint may result in its dismissal. *Abeloff v. Barth,* 119 F.R.D. 332, 334 (D.Mass.1988); *Goldberg v. Meridor,* 81 F.R.D. 105, 110 (S.D.N.Y.1979).

Approximately one year ago, the 1990 Complaint was removed to federal court, where the verification requirement applies. It does not appear that the Plaintiffs have made any effort to verify the 1990 Complaint since its removal. The Plaintiffs now "offer" to verify the 1990 Complaint, not by a formal motion to amend in opposition to the instant motion for summary judgment, but by way of a footnote in their Opposition Brief. Opposition Brief at 10 n. 4.

In light of these circumstances, and in light of the fact that the 1990 Complaint fails to plead with the particularity required under Fed.R.Civ.P. 23.1 that demand was made and wrongfully refused as to the Prime Transaction, a transaction which is substantially the subject of the 1990 Complaint, the 1990 Complaint is dismissed in its entirety without prejudice. The Plaintiffs may refile a *new verified* complaint (not an amendment of the 1990 Complaint), if appropriate, at which time

they may replead with the requisite particularity that demand was made and wrongfully refused as to the Prime Transaction.

*Conclusion*

For the foregoing reasons, partial summary judgment is granted and the complaint is dismissed in its entirety and without prejudice under Fed.R.Civ.P. 23.1.